1998-NMSC-009

957 P.2d 51

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Anthony STILLS, Defendant–Appellant.**

No. 22733.

Supreme Court of New Mexico.

March 16, 1998.

Lamberton & Riedel, Hilary Lamberton, Santa Fe, for Appellant.

Tom Udall, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

FRANCHINI, Chief Justice.

{1} Anthony Stills was convicted, following a jury trial, of felony murder under NMSA 1978, § 30–2–1(A) (1994), child abuse under NMSA 1978, § 30–6–1(C) (1989), criminal sexual penetration in the first degree under NMSA 1978, § 30–9–11(A) (1993), kidnapping under NMSA 1978, § 30–4–1 (1973), and two counts of tampering with evidence under NMSA 1978, § 30–22–5 (1963), in the death of his stepdaughter Hollie Karr. He appeals his conviction on the bases that: DNA test results admitted at trial were inadmissible, the trial court improperly refused to instruct the jury on voluntary manslaughter, he was deprived of a proper defense by the trial court's limitations on expert testimony, physical evidence was improperly introduced, prosecutorial misconduct, cumulative error, insufficient substantive evidence to suggest conviction beyond a reasonable doubt, and ineffective assistance of counsel. We affirm.

*Facts.*

{2} Hollie Karr lived in an apartment with her mother, Melanie Kulick, and her stepfather, the Defendant. On April 19, 1993, at approximately 4:00 P.M. paramedics were called to the apartment where they found the Defendant attempting to give mouth-to-mouth resuscitation to his teenage step-daughter, Hollie. Hollie was dead. It was later determined that death was caused by a severe beating to the head. Hollie was found with her clothing in disarray; her shirt around her neck exposing her chest, her shorts around her ankles, and her underpants pulled up and wedged between her legs.

{3} On the day of the murder, Hollie was driven home from school by her friend Kevin. They arrived at the apartment between 2:55 P.M. and 3:00 P.M. When they reached the apartment building Kevin recognized Stills' car in the parking lot. Kevin left immediately for golf practice.

{4} Chris, a close friend of Hollie, called her between 3:10 P.M. and 3:15 P.M. He testified that she was sobbing and very upset when she answered the telephone. She asked him if he could come over. Chris testified at trial that he knew that Hollie's mother was at work and that he was not allowed to go to a girl's home if her parents were not home. Chris asked his mother if he could visit Hollie but she said no when he told her that Hollie's mother was at work. He called Hollie a second time, approximately ten minutes later, and the answering machine answered. Chris testified that Hollie

did not like the Defendant and that she was against her mother marrying him.

{5}   Hollie's mother, and the Defendant had married just eight months before Hollie's death, however, they had known each other since Hollie was two-years old and lived together during some of those years. The Defendant testified that he had once shoved Hollie while the three of them were living together in California.

{6}   Hollie's mother came home from work at about 3:30 P.M. to pick up some headache medicine.   The Defendant's car was not there. In the bathroom she noticed blood on the light switch and the door, and thought the Defendant had cut himself.  She did not hear or see any sign of Hollie, and believed that her daughter was late coming home from school.   She returned to work after spending approximately five minutes in the apartment.   At approximately 3:50 P.M. she received a call at work from the Defendant, who told her he believed Hollie was dead.   She arrived back at the apartment around 4:00 P.M. The Defendant's car was in the parking lot by the apartment door.  This was a different parking spot than the car was in when it was observed by Kevin a little before 3:00 P.M.

{7}   The Defendant told police, and later testified, that he had found Hollie and unsuccessfully tried to give her mouth-to-mouth resuscitation.   His clothes had become stained with blood as the result of his efforts to revive her, he had changed, and then called her mother to tell her what had happened.   The Defendant did not call 911. Hollie's mother asked a co-worker to call 911 as she rushed from work to return to the apartment.

{8}   As police began their investigation, they received information that there were bloody gloves at a nearby intersection.  Officers looked for the gloves unsuccessfully that day.   However, the following day, another officer found one glove in the gutter and another in a sewer.  Missing fingertips from the gloves matched a bloody piece of vinyl glove found under the dust ruffle of Hollie's bed next to her body.

{9}   A portion of a vinyl glove, found at the intersection, by a sewer grate, was subjected to DNA typing analysis, using the RFLP technique.   It was determined that the blood on the glove was consistent with Hollie's blood.   The testimony at trial was that the probability that a randomly-chosen individual would have the same DNA profile as the blood found on the glove samples analyzed by the RFLP technique is 1 in greater than 5.5 billion.

{10}   Blood on the gloves was further analyzed using PCR amplification.  This technique makes copies of a small region of DNA permitting DNA analysis of very small samples when larger samples cannot be obtained. The analysis determined that samples of blood found on the gloves were consistent with Hollie's blood and with the Defendant's blood.  A box of the same type of gloves was found under the kitchen sink in the apartment, one pair was missing.

{11}   The Defendant explained that he had brought the box of gloves home from work, and, on the afternoon Hollie died, he laid a pair out on a counter planning to change the oil in his car.   Instead he went for a drive to think about problems he was having in school, leaving the gloves behind.

{12}   James Galvan is a former police officer who was incarcerated at the Bernalillo County Jail when the Defendant was taken into custody.  He testified for the prosecution.  He admitted on the stand that he took bribes while a police officer, and has numerous felony convictions for crimes involving fraud, dishonesty and worthless checks.  He testified that he did not receive any consideration in exchange for his testimony concerning a conversation he had with the Defendant shortly after the Defendant was taken to jail. Galvan testified that the Defendant came to his cell, asked him for a Bible, and said if he did not talk to someone he would go crazy. He observed that the Defendant repeatedly rubbed his hands together, and that his hands were cut and bruised.  The Defendant told Galvan that he had a fight with his stepdaughter, that he was upset with her and that she had said she was not going to let him "use her" anymore.   The Defendant said he got into a heated argument with her, and

he slapped her. At that point she said her dad would come from Carlsbad, California and kill him, she pushed him, swore at him, and told him to get out of her room. He told Galvan that he hit her several times and that he must have "hit her hard" because his hand hurt and "he hit her like a man." According to Galvan, the Defendant said he was planning an alibi to explain his injured hand. The Defendant told Galvan that he planned to say that when he heard Hollie was dead he became so upset that he hit a wall.

{13} Hollie was severely beaten around the face, head and neck, and she was strangled by hand and with a bathrobe sash. A forensic pathologist who performed an autopsy on Hollie, described the injuries to her jaw and eye as "consistent with a blow from a fist." The knuckles on the Defendant's right hand were swollen and there was a fresh cut on the knuckles. Photographs of the Defendant's hands were taken on the morning after the murder and admitted into evidence. There was expert testimony that the swelling and abrasions visible in the photographs of Defendant's right hand were the kind of injuries one would expect to see on the fist of the person who beat Hollie. Photographs of the Defendant's neck and face showed scratches which were red and appeared fresh.

{14} Defendant explained the bruises saying that after he discovered Hollie's body, he became upset and hit a wall outside the apartment. However, several officers and a paramedic described the Defendant's reaction to Hollie's murder as calm, cool, and not visibly upset. He indicated to one officer that he wanted to make a 5:00 P.M. appointment.

{15} After paramedics had arrived, but before police had a chance to examine the apartment for evidence, Defendant washed away bloodstains, around a lightswitch and around the door in the master bathroom. The lightswitch, sink and counter in the master bathroom were sprayed with the chemical Luminal and tested positive for the presence of blood. Further Luminal tests confirmed the presence of blood on the floor of the apartment's other bathroom, which connected to Hollie's bedroom. None of the blood

spots were visible to the naked eye, indicating that someone had attempted to clean them up. Hollie's mother testified that she later noticed towels missing from the bathroom.

*The Experts*

{16} A hearing on Defendant's motion to exclude DNA testing evidence was conducted on October 31, 1994, to November 3, 1994.

{17} Richard Guerrieri, the assistant director for the Forensic Identity Laboratory at Roche Biomedical Laboratories, was called by the prosecution. Roche is one of three "major commercial laboratories in the United States currently perform[ing] the majority of all forensic DNA typing." Lisa L. Dahm, *Using DNA Profile as the Unique Patient Identifier In the Community Health Information Network: Legal Implications*, 15 J. Marshall J. Computer & Info. L. 227, 275 n. 23 (1997). The PCR analysis in this case was conducted by Roche. Guerrieri testified as an expert and as the person who had performed the PCR testing on various samples collected by the Albuquerque Police Department. His findings included a determination that blood consistent with that of Hollie, and blood consistent with that of the Defendant were found on the vinyl gloves.

{18} Dr. Martin Tracey was called by the prosecution and found to be an expert in molecular biology, and population genetics. At the pre-trial hearing, the court withheld determination of whether he was an expert in PCR testing. However, at trial, in response to Defense Counsel's objection that Dr. Tracey had not been qualified as an expert in PCR testing, the court said Dr. Tracey was qualified to analyze PCR results. Dr. Tracey agreed with PCR results Roche reported.

{19} Dr. Gregg Orloff was called by the defense. He was qualified as an expert in molecular biology with a special expertise in PCR technique. He found several deviations from scientific operating procedures and found problems with the control aspect of the Roche protocol. Dr. Orloff stated one could not trust the results of the PCR amplification, and that the PCR testing results were unacceptable and inconclusive.

{20} Cathy Pfefferle, a forensic scientist was admitted as an expert in DNA profiling specifically regarding RFLP and as an expert in the field of forensic serology. She explained that the purpose of DNA testing is to see if a person can be excluded as a potential donor of a stain, and she testified at length about the DNA analysis RFLP. In her opinion Hollie Karr could not be excluded as a possible donor of the stain on both gloves. Ms. Pfefferle also tested carpet samples for the presence of semen. The first tests she conducted were negative. Tests conducted sometime later by Roche on the carpet samples were inconclusive.

{21} Dr. Diane Lavett testified at the pre-trial hearing in support of the defense motion to exclude semen stains on the carpet because the samples had been mistreated by the prosecution. The trial court denied the motion.

*The trial court did not abuse its discretion in admitting PCR analysis.*

■ {22} DNA testing determines the probability that "a sample of blood, tissue, hair, or sperm came from a particular person." *State v. Anderson*, 118 N.M. 284, 287, 881 P.2d 29, 32 (1994). In this case DNA material was analyzed using two techniques: restriction fragment length polymorphism or RFLP analysis, and polymerase chain reaction or PCR analysis. Both methods can be used to determine if there is a match between genetic material found at a crime scene and the genetic material of a Defendant. "A 'match' does not mean that the suspect was definitely the source of the genetic material found at the crime scene, however, but simply that the suspect cannot be eliminated as the potential source." *Id.*, 118 N.M. at 288, 881 P.2d at 33 (quoting *State v. Vandebogart*, 136 N.H. 365, 370, 616 A.2d 483, 486 (1992)).

{23} In *State v. Anderson*, we held that DNA evidence is admissible in New Mexico and that questions concerning the test results or statistical probabilities go to the weight of the evidence and are the concern of the fact finder. *Anderson*, 118 N.M. at 303, 881 P.2d at 48. That case concerned the DNA profiling process used by the FBI,

RFLP analysis. This case concerns a different technique, PCR. This is the first case in which an appellate court in New Mexico has addressed the PCR technique, which enables copies of DNA to be created.

{24} The PCR technique, a form of DNA analysis, "is extremely valuable. It permits DNA profiling of samples containing much smaller quantities than is required for RFLP." *Commonwealth v. Sok*, 425 Mass. 787, 683 N.E.2d 671, 674 (1997). Although PCR was developed after RFLP, "[o]ther states have approved the use of the PCR test in criminal proceedings since 1992." *Barnes v. State*, 704 So.2d 487, 497 (Ala.Cr.App. 1997). In fact, "PCR analysis has received overwhelming acceptance in the scientific community and the courts." George Bundy Smith & Janet A. Gordon, *The Admission of DNA Evidence in State and Federal Court*, 65 Fordham L.Rev. 2465, 2470 (1997) (citing *People v. Morales*, 227 A.D.2d 648, 643 N.Y.S.2d 217, 218–19 (1996)); *see also U.S. v. Beasley*, 102 F.3d 1440, *cert. denied*, —— U.S. ——, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997).

{25} Defendant argues that the court committed reversible error when it ruled that results obtained using the PCR technique were admissible at trial. He argues that the PCR test results did not meet the threshold admissibility standards set forth in *Anderson*, 118 N.M. at 291, 881 P.2d at 36.

{26} In determining whether scientific evidence is admissible, New Mexico courts look to the New Mexico Rules of Evidence which provide:

> If scientific, technical or other special knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience or education may testify thereto in the form of an opinion or otherwise.

Rule 11–702 NMRA 1997.

■ {27} Rule 11–702 requires the trial court to apply a three-part test to determine whether scientific evidence is admissible. First, the expert must be qualified; second, the testimony must assist the trier of fact, it must be relevant; and third, the evidence

must be reliable. *Anderson,* 118 N.M. at 291, 881 P.2d at 36. With respect to the third part of this test, in *Anderson* we looked to *Daubert* and set forth four factors which the trial court must consider in determining whether scientific evidence is reliable:

> (1) whether a theory or technique "can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known potential rate of error" in using a particular scientific technique "and the existence and maintenance of standards controlling the technique's operation;" and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*Anderson,* 118 N.M. at 291, 881 P.2d at 36 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 580, 113 S.Ct. 2786, 2790, 125 L.Ed.2d 469 (1993)).

{28} Defendant agrees that the experts in this case were all qualified in their respective fields with the exception of Dr. Tracey. At the pre-trial hearing, Dr. Tracey was found to be an expert in molecular biology and population genetics, but the trial court withheld determination of whether he was an expert in PCR testing. At trial, however, the court found that Dr. Tracey was qualified to review results obtained using the PCR technique. In addition, there was sufficient testimony from experts qualified in PCR analysis concerning peer review and acceptance in the scientific community to allow the jury to properly weigh this evidence.

■ {29} Defendant also challenges the reliability of the PCR method with respect to the first factor, testability. "Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796. Defendant takes issue with our determination in *Anderson* that when a defendant attempts to refute a theory or method "with evidence about deficiencies in both the results and the testing of the results," a defendant has effectively conceded that the theory and the methods can be tested. *See* 118 N.M. at 297, 881 P.2d at 42 (quoting

*United States v. Bonds,* 12 F.3d 540, 559 (6th Cir.1993)). In adopting this method of determining whether a scientific principle can be tested, we looked to the Sixth Circuit which in turn looked to *Daubert. Id.* In *Daubert* the Supreme Court determined that " 'the criterion of the scientific status of a theory is its refutability, falsifiability, or testability' " *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2797 (quoting Karl Popper, *Conjectures and Refutations: The Growth of Scientific Knowledge* 37 (5th ed.1989)). " 'Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.' " *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796 (quoting Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substance Litigation: The Legacy of Agent Orange and Benedictin Litigation,* 86 Nw. U.L.Rev. 643, 645 (1992)). "A technique is valid if it produces accurate results; that is if it correctly identifies true matches and non-matches ... and if it produces the same results time and time again." Smith & Gordon, *supra,* at 2477. We note that PCR analysis has been subjected to "countless number[s] of tests and experiments ... since the technique was first discovered in 1985." Brian Huseman, *Taylor v. State, Rule 706, and the DNA Database: Future Directions in DNA Evidence,* 22 Okla. City U.L.Rev. 397, 436 (1997).

{30} Defendant concedes that the second factor, peer review and technology, is satisfied in this case.

■ {31} With respect to the third factor, known potential rate of error, Defendant challenges the manner in which Roche conducts its tests and the manner in which this specific test was conducted by Roche. Defendant argues that *Anderson* improperly held that deficiencies in calculating a rate of error and lack of blind external proficiency tests concerns the weight of the evidence and not admissibility. *Anderson,* 118 N.M. at 299, 881 P.2d at 44. However, we hold, as we did in *Anderson,* that "[a]ny controversy over the results of the testing and the statis-

tical calculations goes to the weight of the evidence and is properly left to the trier of fact." *Id.* at 303, 881 P.2d at 48. The jury heard the testimony of Mr. Guerrieri who worked at Roche concerning Roche's procedures to prevent error, and they heard from Dr. Orloff who testified to problems he detected when he examined the Roche PCR results. They also heard from other experts. It was for the jury to determine what weight to give the PCR results in this case.

{32} Lastly, Defendant argues that PCR testing has not been accepted by the scientific community and therefore this factor should weigh against admissibility. He points to a National Research Council report which states PCR has "enormous promise" in the future, and that "further experience should be gained with respect to PCR in identity testing." Committee on DNA Technology in Forensic Science, National Research Council *DNA Technology in Forensic Science* (1992). However, Dr. Tracey testified that since this report was released in 1992, there had been "a lot of peer reviewed public validation of PCR technology." Both Mr. Guerrieri and Dr. Orloff agreed that the PCR method had been subjected to peer review and publication in the scientific community. "In the years since its invention, the PCR technique has been substantially improved." Smith & Gordon, *supra,* at 2472. We disagree with the Defendant and hold that there was sufficient evidence to support the trial court's conclusion that PCR has been accepted in the scientific community.

{33} An appellate court will reverse a trial court's decision to admit scientific evidence only when there has been an abuse of discretion. *State v. Alberico,* 116 N.M. 156, 160–70, 861 P.2d 192, 205–206 (1993). Abuse of discretion exists when the trial court acted in an "obviously erroneous, arbitrary, or unwarranted manner." Rule 11–702 NMRA 1986; *see also Alberico,* 116 N.M. at 170, 861 P.2d at 206. We see no evidence that the trial court's decision to admit DNA analysis using the PCR method was erroneous, arbitrary or unwarranted. We hold that

PCR evidence is admissible in New Mexico Courts.

{34} Defendant argues that Dr. Tracey should not have been allowed to testify as an expert in PCR profiling because of his limited experience in PCR testing. Dr. Tracey was qualified as an expert in molecular biology as a population geneticist and in DNA profiling at the pretrial hearing. At that time the court withheld a determination as to his expertise in the area of PCR until after cross-examination. The court noted that Dr. Tracey had "some expertise" in PCR analysis and that this could be a question of weight rather than admissibility. There was nothing improper about the court withholding its determination of Dr. Tracey's expertise. The proper time to determine an expert's competency is at trial. *Griego v. Grieco,* 90 N.M. 174, 176, 561 P.2d 36, 38 (Ct.App.1977). We have reviewed Dr. Tracey's testimony and hold that this is a question of weight rather than admissibility. It is clear from the record that Dr. Tracey was an expert in DNA analysis including both the RFLP and the PCR technique. He was familiar with the history of both and with scientific literature in the area. The judge should have more clearly qualified Dr. Tracey as an expert in the PCR method; however, his failure to do so does not constitute reversible error.

*In the absence of sufficient provocation Defendant was not entitled to a jury instruction on voluntary manslaughter.*

{35} Voluntary manslaughter is "manslaughter committed upon a sudden quarrel or in the heat of passion." NMSA 1978, § 30–2–3(A) (1994). Defendant contends that James Galvan's testimony raises an inference that Defendant was provoked and that any actions were taken in the heat of passion and therefore Defendant was entitled to a voluntary manslaughter jury instruction. *See State v. Chamberlain,* 112 N.M. 723, 728, 819 P.2d 673, 678 (1991) (holding defendant is entitled to jury instruction where the evidence supports defendant's theory of the case). Galvan, an inmate at the time Defendant was incarcerated, testified that Defendant told him in prison that he and Hollie argued, and that Defendant slapped her. That Hollie threatened that her father

would come from California and kill him, cursed at him, and pushed him. We agree that Hollie's words or push did not constitute sufficient provocation, requiring the court to give an instruction on voluntary manslaughter.

{36} It is well established that words alone are not enough to arouse the passions such that murder is reduced to manslaughter. *State v. Trujillo,* 27 N.M. 594, 203 P. 846 (1921). "Mere sudden anger or heat of passion will not reduce the killing from murder to manslaughter. There must be adequate provocation." *State v. Nevares,* 36 N.M. 41, 44, 7 P.2d 933, 936 (1932); *see also State v. Abeyta,* 120 N.M. 233, 244, 901 P.2d 164, 175 (1995). The adequacy of the provocation must be determined by considering whether it would have created the passion offered in mitigation in the ordinary person of average disposition; if it would do so, then it is adequate and will reduce the offense to manslaughter. *State v. Parish,* 118 N.M. 39, 46, 878 P.2d 988, 995 (1994). The uniform jury instruction for voluntary manslaughter explains "sufficient provocation" as "any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions. The provocation must be such as would affect the ability to reason and to cause a temporary loss of self control in an ordinary person of average disposition." UJI 14–222 NMRA 1997.

{37} The trial court, in refusing to submit a charge of manslaughter to the jury said:

> I thought significantly in advance of even discussing instructions yesterday about voluntary manslaughter, and I think as a matter of law, that it's not required to be given in this situation. And I think it would set terrible social policy to even suggest that for some reason a parent, somehow in a household with a child, because the child said something angry or maybe even pushed the parent, that would present a factual question about reducing the crime of murder to voluntary manslaughter. I think it is clear as a matter of law and undisputed that that's not the type of extreme ... emotions, and its clearly undisputed.

The trial court judge looked to the test of the ordinary person of average disposition when he spoke of social policy concerns and correctly determined that an ordinary person in this situation would not have been provoked.

{38} This case is distinguishable from *State v. Benavidez,* 94 N.M. 706, 708, 616 P.2d 419, 421 (1980), in which we held that a series of events over time constituted sufficient provocation to sustain a conviction of voluntary manslaughter. In that case the victim had "stolen a television belonging to the defendant," "introduced defendant's son to the use of heroin," "assaulted defendant's son in the past," "threatened both defendant and his son with death," "was arguing with defendant at the time of the killing," and "made some type of motion which could have been an attempt to strike or move for a weapon." *Id.* In this case, there was not a pattern of this kind and no indication that Hollie's behavior ever rose to the level of the victim in *Benavidez.* The trial court ruled that even if Galvan's testimony concerning Hollie's behavior was accepted as true it would not be sufficient as a matter of law to require an instruction for voluntary manslaughter. We agree.

{39} This case is like *State v. Farris,* 95 N.M. 96, 97, 619 P.2d 541, 542 (1980) *overruled on other grounds, Sells v. State,* 98 N.M. 786, 788, 653 P.2d 162, 164 (1982), where we found insufficient provocation. In that case, the defendant and his wife were separated. Defendant had been threatened in the past by the wife's boyfriend and the boyfriend's brother had previously threatened defendant. The defendant and his wife got into a fight, she told him to leave her alone and declared that her boyfriend could come into the family home whenever he wanted. She then poked the defendant in the chest, and he shot and killed her. *Id.* In *Farris* we restated the rule that words alone will not constitute sufficient provocation and continued "[w]e do not think the mere addition of poking in the chest to 'words alone' is sufficient to show provocation at the time of the killing." *Id.* at 97, 619 P.2d at 541.

{40} In *Sells* we adopted a less restrictive approach, holding that under certain limited circumstances the content of words could amount to provocation. *Sells,* 98 N.M. at

788, 653 P.2d at 164. Even if the fact that Hollie pushed the Defendant and threatened her father would come from California were true, we hold that these facts are not adequate to constitute sufficient provocation. The evidence did not support an instruction on a lesser included offense. We hold that as a matter of law a charge of voluntary manslaughter should not have been submitted to the jury.

*The trial court did not abuse its discretion in precluding a portion of expert testimony where defense counsel failed to comply with procedural rules, the court weighed the prejudice to the defense, and the court viewed preclusion as necessary to protect the effective administration of justice and integrity of the system.*

{41} Defendant argues that the limitations placed on the testimony of an expert witness, Dr. Kris Sperry, deprived him of a fair trial. Dr. Sperry is a forensic pathologist, who was precluded by the court from testifying concerning hand injuries because the defense had not timely disclosed that he would testify on this issue. Rule 5–502(A)(2) NMRA 1997.

{42} When interviewed by the prosecution pre-trial, Dr. Sperry said he would testify about vaginal injuries only and would not testify about anything else. After the trial had commenced, and after other experts had testified, Dr. Sperry reviewed the evidence and the defense informed the court that Dr. Sperry's testimony would be expanded to include blood spatter testimony, testimony concerning sperm found at the scene, and injuries to the victim and to Defendant's hand. The court permitted Dr. Sperry to testify about blood spatter on the basis that certain expert testimony may have come as a surprise and that Dr. Sperry's testimony would overcome any surprise. The court, however, would not permit him to testify concerning injuries to the Defendant's hand and the facial injuries to Hollie. Apparently, Dr. Sperry would have testified that he was surprised at the prosecution's expert Dr. Ward's opinion that the injuries to Defendant's hand were consistent with the beating to Hollie. The court found that the Defendant was required to give information concerning Dr. Sperry's testimony to the State pre-trial and that there had been no surprise warranting Dr. Sperry's additional testimony. The court, in coming to this determination, considered that the trial had commenced, and expert witnesses had been called.

{43} Although preclusion of a defense witness's testimony as a sanction for violation of a discovery rule "is only appropriate in limited circumstances," if the court determines that the defense has withheld information for a tactical advantage then the court is within its discretion to preclude. *McCarty v. State,* 107 N.M. 651, 653, 763 P.2d 360, 362 (1988) (quoting *Taylor v. Illinois,* 484 U.S. 400, 412–16, 108 S.Ct. 646, 655–56 (1988)). "Before resorting to preclusion, a trial judge should weigh not only the prejudicial effect of noncompliance on the immediate case, but also the necessity to enforce the rule to preserve the integrity of the trial process." *Id.* at 655, 763 P.2d at 364. In this case, the judge stated for the record that he believed the defense counsel was engaging in delay tactics, that preclusion was necessary to protect the integrity of the judicial system, and efficient administration of justice. The court also looked to the impact on the State and the defense.

{44} The trial court's decision to exclude evidence is reviewed for abuse of discretion. *State v. Apodaca,* 118 N.M. 762, 770, 887 P.2d 756, 764 (1994). We do not believe that the trial court abused its discretion in limiting Dr. Sperry's testimony.

*The trial court did not err when it refused to exclude evidence of the carpet samples containing semen stains.*

{45} Carpet samples were obtained from the area under and near Hollie's body. Pre-trial Defendant requested that all evidence concerning carpet samples be suppressed. These samples were tested for semen by APD forensic scientist Cathy Pfefferle. The test was negative and the samples were frozen. Some months later the samples were removed from the freezer and placed in a locked dark evidence room. The samples were reexamined with a newly acquired,

more powerful microscope and evidence of semen was discovered in very small quantities. The samples were then sent out for PCR analysis which was inconclusive. The sample was then refrozen. Defendant argues that because the State allowed the sample to degrade, no evidence concerning the carpet stains should have been allowed at trial.

{46} In the absence of evidence that the State acted in bad faith, failure to preserve potentially exculpatory evidence for future testing is not grounds for excluding relevant, probative testimony regarding that evidence. *State v. Ware*, 118 N.M. 319, 321–322, 881 P.2d 679, 681–682 (1994).

*Defendant was not denied a fair trial by prosecutorial misconduct.*

{47} Defendant claims he was denied a fair trial due to prosecutorial misconduct. The conduct Defendant objects to concerns the State's allegedly eliciting testimony that had been ruled inadmissible, and comments made during closing arguments.

{48} Defendant's first claim is based on a ruling by the court which precluded discussion on a prior altercation between the Defendant and Hollie. The Prosecutor asked the Defendant whether, at a previous time, the Defendant had been asked to leave Hollie's and her mother's home. Defendant in his answer included the fact that he had pushed and hit Hollie during that altercation which had been ruled inadmissible by the court. Defense counsel did not object or request a mistrial at that time, but did request a mistrial on this basis several hours later. The court heard argument on the record, and ruled that no prosecutorial misconduct requiring a mistrial had occurred. We agree.

{49} The Standard of Review for claims of prosecutorial misconduct is abuse of discretion. *Abeyta*, 120 N.M. at 246, 901 P.2d at 177. The trial court found that the Defendant could have answered the Prosecutor's question without giving details of the incident. We agree and affirm the trial court's determination that a mistrial was not warranted under these circumstances.

{50} Defendant next claims that during closing argument the State: (1) improperly shifted the burden by saying the defense could not "prove" the evidence was mishandled or disprove certain other facts in evidence; (2) argued facts not in evidence: on the day of Hollie's death Defendant had no tears, that the carpet stains might have been wet, that Defendant stated blood was coughed onto him; (3) improperly expressed personal opinion, vouched for his witness, and appealed to the prejudices of the jury by saying Dr. Sperry was another one of those folks coming in from Georgia; and (4) that Judge Brennan improperly directed Defense Counsel to stand up when making an objection. We have said that where it is alleged that the prosecutor made improper prosecutorial comments in closing the question is whether those comments deprive the Defendant of a fair trial. *State v. Brown*, 1997 NMSC 029, ¶ 23, 123 N.M. 413, 417, 941 P.2d 494, 498. We hold that the Defendant was not deprived of a fair trial.

{51} Defendant argues that cumulative error requires a reversal in this case. "In New Mexico the doctrine of cumulative error is strictly applied." *State v. Martin*, 101 N.M. 595, 601, 686 P.2d 937, 943 (1984). It cannot be applied when "the record as a whole demonstrates that the defendant received a fair trial." *Id.* We conclude that the defendant received a fair trial and that the doctrine is not applicable in this case.

{52} Defendant also argues that he was denied due process and a fair trial. He claims first that it was improper for the trial court to order the defense to turn over transcripts of pre-trial interviews with witnesses for the prosecution. Defendant does not cite authority for his argument that "[t]his order is not contemplated under the criminal rules of discovery and was unfair." Rule 5–502(A) NMRA 1997 concerns information "the defendant shall disclose or make available to the state." Rule 5–502(A)(3) provides that defendant shall disclose "a list of names and addresses of the witnesses the defendant intends to call at the

trial, together with any statement made by the witness." We hold that the trial court's order in this case was within the contemplation of the criminal rules of discovery. As long ago as *State v. Martin,* 101 N.M. 595, 686 P.2d 937 (1984), we held that criminal procedure rules "provide for reciprocal discovery rights and are intended to provide ample opportunity for investigation of facts." *Martin,* 101 N.M. at 610, 686 P.2d at 953. Further we disagree with Defendant that the judge's decision to allow the prosecution to present its rebuttal closing arguments the next day was improper.

■ {53} The Defendant makes several other allegations of error on the part of the trial court which lack specificity, citation to the record, or both, and those allegations we hold to be without merit. *In re Adoption of Doe,* 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) ("issues raised in appellate briefs which are unsupported by cited authority will not be reviewed by us on appeal."); *State v. Aragon,* 109 N.M. 632, 634, 788 P.2d 932, 934 (Ct.App.1990) (issues must be adequately argued and supported by authority or will be deemed abandoned).

{54} Defendant next claims that "the three attorneys who defended him at trial provided ineffective assistance of counsel," in that they did not properly prepare and investigate the case. We see nothing in Defendant's argument or the record that suggests that defense counsel's representation was deficient such that defendant was prejudiced and deprived of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687–696, 104 S.Ct. 2052, 2064–2069, 80 L.Ed.2d 674 (1984).

{55} Defendant's final argument is that the evidence was insufficient to support his conviction. The Defendant questions whether circumstantial evidence that does not preclude a rational theory of the Defendant's innocence should sustain a conviction. "In determining whether substantial evidence was presented to support charges, an appellate court must view the evidence in the light most favorable to the State and indulge all reasonable inferences which support the conviction." *State v. Garcia,* 114 N.M. 269, 273 n. 8, 837 P.2d 862, 866 n. 8 (1992) (quoting *State v. Manus,* 93 N.M. 95, 98, 597 P.2d 280,

283 (1979)). Having reviewed the record we hold that there was substantial evidence to support these convictions.

*Conclusion.*

{56} We hold that the trial court did not abuse its discretion in admitting DNA typing evidence under the PCR technique. It is the role of the jury to weigh evidence concerning the manner in which the evidence was collected and stored, and evidence concerning the results of the test and statistical calculations, and resolve any controversy with respect to this evidence. Further, the trial court, in the absence of adequate provocation, properly refused to submit an instruction to the jury on voluntary manslaughter. Defendant was not deprived of a proper defense by the trial court's limitation on expert testimony; physical evidence was not improperly introduced; neither questions posed by the Prosecutor nor comments made by him during closing argument deprived Defendant of a fair trial. There was substantial evidence to suggest conviction beyond a reasonable doubt. Defendant's claim of ineffective assistance of counsel is also without merit. We affirm.

{57} **IT IS SO ORDERED.**

BACA and McKINNON, JJ., concur.