This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-38206**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**BENJAMIN PRITCHETT,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF ROOSEVELT COUNTY**
**Donna J. Mowrer, District Judge**

Hector H. Balderas, Attorney General
Marko D. Hananel, Assistant Attorney General
Santa Fe, NM

for Appellee

Harrison & Hart, LLC
Nicholas T. Hart
Ramon A. Soto
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**IVES, Judge.**

**{1}** Defendant Benjamin Pritchett appeals his conviction for one count of criminal sexual penetration of a minor (child under thirteen years of age) in the first degree (CSPM), contrary to NMSA 1978, Section 30-9-11(A), (D)(1) (2009). Defendant contends that we must reverse because (1) the district court, in a ruling that the State concedes was both erroneous and sufficient to preserve the issue, admitted a privileged communication Defendant made to his pastor; (2) plain error occurred when the district court admitted testimony regarding a communication that Defendant argues was subject

to the spousal communications privilege; and (3) cumulative error requiring reversal resulted from the combined effect of the admission of the testimony regarding these communications. We affirm, concluding that (1) the admission of the pastor's testimony was harmless error; (2) assuming the admission of the testimony asserted to be subject to the spousal communications privilege is reviewable for plain error and that the privilege applies, no plain error occurred; and (3) the doctrine of cumulative error does not require reversal.

**BACKGROUND**

{2}     In 2016, Victim, a twelve-year-old member of Defendant's extended family, told Defendant's daughter-in-law that Defendant had sexually abused her in 2013. Defendant was arrested and charged with CSPM after Victim's disclosure. Other than a demonstrative exhibit irrelevant to this appeal, the evidence presented at trial consisted entirely of witness testimony. The State presented the testimony of Victim, Defendant's daughter-in-law, Defendant's wife, and Defendant's pastor, and Defendant testified on his own behalf. There was no dispute that Defendant had been in the room where Victim was sleeping on the night in question. The only question for the jury to resolve was what happened while he was there, and Victim and Defendant, the only witnesses to provide firsthand accounts of what occurred, gave conflicting testimony on this issue. If believed, Victim's testimony established that Defendant had committed CSPM. Defendant, in contrast, maintained that all that happened was that Victim had woken him up by rolling over, placing her head on his shoulder, and kissing Defendant on the cheek and mouth, and that he had gotten out of the bed at that point. Thus, the outcome at Defendant's trial hinged entirely on a credibility determination: if the jury had believed Defendant, he would have been acquitted; because it believed Victim, it found Defendant guilty.

{3}     A subsidiary issue developed at trial about whether Defendant had admitted to criminal conduct in three statements Defendant made about the events of the relevant night after Victim's disclosure. The first was a communication Defendant made to his wife;[1] the second, a statement Defendant made to a group consisting of his wife, son, and daughter-in-law; and the third, a communication Defendant made to his pastor. Regarding the first statement, Defendant's wife testified that she asked Defendant a "general question"—"Did you do this?" or "Did you do this to [Victim]?"—after she learned of Victim's disclosure, but did not ask Defendant anything about what, specifically, had happened. Defendant replied "yes" and apologized.

{4}     Defendant made the second statement when Defendant's wife, daughter-in-law, and son met with Defendant in his home two days after Victim's disclosure. In recounting this statement, Defendant's wife testified that Defendant, when asked whether "it [was] true that [he had done] this," answered, "Yes, and I'm sorry." Although

---

[1]The State contends that the trial record is insufficient to establish that Defendant and the witness he identifies as his wife were legally married. We refer to this witness as Defendant's wife for convenience, without expressing any view on the issue. We also note that in 2019, when the trial occurred, she testified that Defendant was her ex-husband.

the specifics of what "this" was were not discussed, Defendant's family had organized the meeting because of Victim's disclosure, and Defendant's wife accordingly believed that Defendant was apologizing "for the actions he had towards [Victim]." Defendant's daughter-in-law provided a more detailed account about the second statement that was along the same lines. She testified that she told Defendant during the meeting that she "already knew everything that had happened between him and [Victim] and . . . just wanted him to tell [her] . . . if he had done something to her." When pressed after initially denying that anything had occurred, Defendant said, "Yes, something happened." And Defendant apologized: "he just kept saying he was sorry." Although Defendant was not asked about the specifics of what he had done, Defendant's daughter-in-law likewise interpreted Defendant's statement to be an admission to Victim's account of events, reiterating that she "told him that [Victim] had told [her] everything and that [she] knew everything that [Defendant] had done." Believing that prosecution would be unlikely, she then told Defendant that his family would not press charges if Defendant went "to a rehab," and Defendant "agreed to go."

{5}     Defendant made the third statement in a counseling session with his pastor. At the outset of trial, the district court ruled that this statement was admissible under NMSA 1978, Section 32A-4-3 (2005), New Mexico's mandatory child abuse reporting statute. The State consequently called Defendant's pastor as a witness and asked him about what, specifically, Defendant had told him during the relevant conversation. After explaining that Defendant's wife had made him aware of Victim's disclosure, Defendant's pastor testified that Defendant told him that Victim had moved close to him, that they had kissed, and that, in Defendant's "exact words," "he had sex with her." Defendant never indicated that only a kiss occurred. The pastor urged Defendant "to turn himself in to the sheriff and confess what he had done." Defendant's pastor repeated this account of the conversation when called as a rebuttal witness on the following day of trial, when he also testified that, before the meeting, he told Defendant that he "kn[ew] about the meeting [Defendant] had with [his] family and . . . about his confession about what he did to [Victim]."

{6}     In his testimony, Defendant admitted that all three of these conversations had occurred, but offered different accounts of these conversations and vastly different explanations for the statements he had made within them. According to Defendant, because nobody ever explained the specifics of what he was accused of, he had believed that the purpose of each conversation was to discuss the kiss he claimed Victim had given him. Thus, he admitted apologizing to his wife although he did not know what, exactly, she believed he had done. And Defendant testified that he had apologized to his assembled family members (his wife, son, and daughter-in-law), but never explained that he was referring to a kiss, instead saying only that he was "sorry [he] didn't say anything sooner." Although he acknowledged that the relevant night was more than two years gone and that he knew the meeting was specifically organized because his son and daughter-in-law wanted "to talk" to him, he "did not think it was such a big deal at that time." Finally, Defendant testified that he had never gone into detail about what he was admitting to in his conversation with his pastor. He indicated that he did not understand why the pastor told him to turn himself in and asserted that

the pastor was "wrong" in testifying that Defendant had told him that Defendant had sex with Victim.

**{7}** The State made Defendant's three statements a focal point of its case. In closing argument, the prosecutor contended that, although it would be understandable for the jury to have "discomfort with just having [Victim's] testimony," Defendant's statements proved beyond a reasonable doubt that Victim's testimony was true. Relying on the combination of all three statements, the prosecutor argued that it "ma[de] no sense" to conclude that three people "walked away from every one of those] conversations" with "the wrong conclusion that [Victim] had been molested." And, from the outset of trial, the prosecutor placed particular emphasis on Defendant's statement to his pastor, whom the prosecutor characterized in both opening and closing statements as a witness with "no dog in this fight." This emphasis was especially pronounced in closing, where the prosecutor highlighted the pastor's neutrality and role as Defendant's religious advisor, the pastor's testimony that Defendant specifically told him that Defendant had "sex" with Victim, and the undisputed fact that the pastor told Defendant to turn himself in. The jury returned a guilty verdict, and Defendant appealed.

## DISCUSSION

### I. The Admission of the Pastor's Testimony Regarding Defendant's Privileged Communications Was Harmless Error

**{8}** Defendant contends that we must reverse his conviction because the district court erred in admitting his statements to his pastor into evidence. The State concedes that the district court erred but argues that the error was harmless. We agree with the State on both points and therefore conclude that no reversible error resulted from the admission of this evidence.

**{9}** "We review the [district] court's decision to admit evidence . . . for [an] abuse of discretion." *State v. Otto*, 2007-NMSC-012, ¶ 9, 141 N.M. 443, 157 P.3d 8. A district court abuses its discretion when it makes a decision "premised on a misapprehension of the law." *Harrison v. Bd. of Regents of Univ. of N.M.*, 2013-NMCA-105, ¶ 14, 311 P.3d 1236 (internal quotation marks and citation omitted). We apply de novo review in determining the meaning of statutes, *Cordova v. Cline*, 2017-NMSC-020, ¶ 11, 396 P.3d 159, and of our Supreme Court's rules, including "the law of privileges," *Allen v. LeMaster*, 2012-NMSC-001, ¶ 11, 267 P.3d 806 (internal quotation marks and citation omitted), as well as the district court's application of the law to the facts. *State v. Elinski*, 1997-NMCA-117, ¶ 8, 124 N.M. 261, 948 P.2d 1209, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110.

**{10}** Defendant's statements to his pastor fell within the scope of the clergy communication privilege and thus were not admissible at trial. Rule 11-506 NMRA provides that "[a] person has a privilege . . . to prevent another from disclosing[] a confidential communication made for the purpose of seeking spiritual advice by the person to a member of the clergy." The record demonstrates, and there is no dispute,

that Defendant made his statement in a counseling session arranged to provide Defendant with spiritual advice, and that his statements were "confidential" communications—i.e., communications "made privately and not intended for further disclosure." Rule 11-506(A)(2). The privilege created thus applied, and it was obvious error for the district court to rule that New Mexico's child abuse reporting statute, Section 32A-4-3, allowed the court to admit Defendant's statements into evidence. Section 32A-4-3(A) requires "a member of the clergy . . . who knows or has a reasonable suspicion that a child is an abused or a neglected child" to "report the matter immediately" *only if* the information "is not privileged as a matter of law." Insofar as the pastor's knowledge or suspicion that Victim had been abused was based on information that was privileged, the plain language of the statute exempted the matter from disclosure. Moreover, the statute had no bearing on whether or not the pastor's testimony was admissible as evidence in Defendant's trial. As the State concedes, when a legislative enactment purports to govern practice in the courts in a manner inconsistent with a rule adopted by our Supreme Court, the enactment must yield. *See Estate of Romero ex rel. Romero v. City of Santa Fe*, 2006-NMSC-028, ¶ 7, 139 N.M. 671, 137 P.3d 611; *Ammerman v. Hubbard Broad., Inc.*, 1976-NMSC-031, ¶ 17, 89 N.M. 307, 551 P.2d 1354.

**{11}** Although the district court erred in admitting Defendant's statement to his pastor, we conclude that the error was harmless and therefore does not warrant reversal. "Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful." *Tollardo*, 2012-NMSC-008, ¶ 25. In assessing whether the evidentiary error at issue here—an error that was not of constitutional magnitude—was harmless, we ask "whether there is a reasonable . . . probability . . . that the erroneous[ly admitted] evidence . . . affected the jury's verdict." *Id.* ¶ 40 (internal quotation marks and citation omitted). "To judge the 'probable' effect of an evidentiary error, courts must evaluate all circumstances surrounding the error." *State v. Leyba*, 2012-NMSC-037, ¶ 24, 289 P.3d 1215. "We examine the error itself, including the source of the error and the emphasis placed on the error at trial." *Id.* "To put the error in context, we often look at the other, non-objectionable evidence of guilt, not for a sufficiency-of-the-evidence analysis, but to evaluate what role the error played at trial." *Id.*

**{12}** Viewing the trial record in its entirety, we hold that there is no reasonable probability that the evidence of the privileged communications Defendant made to his pastor contributed to Defendant's conviction. If the pastor's testimony had been the only evidence presented at trial other than Victim and Defendant's conflicting accounts of Defendant's conduct, we would find it difficult to conclude that the error the district court made in admitting the testimony was unlikely to have caused Defendant's conviction. If that were the case, inadmissible testimony that Defendant confidentially admitted to having "sex" with Victim to his religious advisor would have been the only evidence the jury had before it to aid in resolving the conflict, and it would strain credulity to suggest that the evidence's admission was not reasonably likely to have been the difference-maker in the collective mind of the jury. But those are not the circumstances before us. As we view the record, the jury had before it evidence that Defendant had separately

admitted to criminal conduct in the form of the testimony regarding his statement to his assembled family, and we think it exceedingly improbable that the jury was persuaded by Defendant's attempts to explain this evidence away. And it is the fact of Defendant's admission to criminal conduct, rather than how many times or to whom it was made, that brought the State over the line.

**{13}** We think it highly unlikely the jury believed that Defendant thought he was informing his family only that Victim had kissed him. It was undisputed at trial that Defendant admitted to his family that *something* had occurred between himself and Victim. Although it was similarly undisputed that the specifics of what occurred were not discussed, Defendant's wife and daughter-in-law provided the jury with an eminently reasonable basis for concluding that Defendant was admitting to the details of Victim's disclosure: neither Defendant nor his family members felt it necessary to express what was meant by the question, "Did you do this?" because Defendant knew what he had done and had been informed that Victim had told his daughter-in-law "everything," and there was thus no need to get into the specifics of actions so reprehensible that discussing them would have been uncomfortable for all involved. To credit Defendant's version of events, the jury would have had to believe that Defendant and his family members had profoundly different understandings about the nature and gravity of what they were discussing and therefore what Defendant was admitting. Specifically, the jury would have had to believe that when asked whether "something happen[ed] with [Victim]," Defendant believed he was being asked whether Victim kissed him on the mouth, and that Defendant answered "yes" and apologized without offering any explanation or seeking clarification. And the jury would have had to believe that Defendant's family members—two of whom testified that the reason for the confrontation was Victim's disclosure, the contents of which Defendant did not significantly dispute—did not press Defendant upon learning that he was only sorry he "didn't say anything sooner." Under these circumstances, we think there is little likelihood that the jury viewed Defendant's account of the family meeting as anything other than a transparently self-serving attempt to escape the consequences of his actual admission.

**{14}** We do not overlook the fact that the State used Defendant's communication to his pastor as "a centerpiece of its case." *Leyba*, 2012-NMSC-037, ¶ 27. In closing argument, the prosecutor emphasized the pastor's role as a spiritual advisor and his neutrality, and the prosecutor repeated the opening-statement characterization of the pastor as a witness with "no dog in this fight." This emphasis was understandable. With the exception of Defendant's daughter-in-law's testimony about pressing charges, the pastor's testimony was apparently the only evidence that Defendant did not—because he could not—seek to explain away as consistent with his contention that the only thing he admitted was that Victim had kissed him. The pastor's testimony also served to buttress the testimony of the State's first two witnesses, since the pastor indicated that Defendant admitted to "ha[ving] sex" with Victim after being made aware that the pastor knew about the meeting Defendant had with his family.

**{15}** Nevertheless, "harmless error review necessarily requires a case-by-case analysis[,]" *Tollardo*, 2012-NMSC-008, ¶ 44, and we conclude that the error here was harmless despite the emphasis placed on the pastor's testimony at trial. As we have explained, the jury was highly unlikely to have been persuaded by Defendant's explanation of his admission to his family. Thus, the only plausible interpretation of the evidence before the jury was that Defendant had admitted to criminal sexual conduct during the family meeting. For that reason, we reject Defendant's apparent argument that, because Defendant's pastor's position as a religious authority figure made him an especially compelling witness, his testimony was likely to have impacted the outcome below.[2] Put simply, there is no reasonable probability that the jury—having heard from Defendant himself that he had made an admission to his family that could only have been understood as an admission to CSPM under the circumstances—was swayed to return a guilty verdict because it believed that Defendant made the same admission to his pastor.

## II.    Assuming the Admission of the Testimony Regarding Defendant's Statement to His Wife Is Reviewable for Plain Error, No Plain Error Occurred

**{16}** Next, Defendant argues that the district court erred in admitting his statement to his wife because that statement was protected by the confidential spousal communication privilege. Although he acknowledges that he did not object to the admission of the statement at trial, Defendant asks us to conclude that it resulted in plain error requiring reversal. *See generally* Rule 11-103(E) NMRA ("A court may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved."); Rule 12-321(B)(2) NMRA (providing that an appellate court may consider plain error raised for the first time on appeal). The State responds that the admission of this testimony was not error at all because Defendant waived any privilege that might have applied when he failed to object and that this issue is therefore reviewable only for ineffective assistance of counsel.

**{17}** We find it unnecessary to resolve this dispute because, even assuming that it was error for the district court to admit this testimony and that the issue is reviewable for plain error, no plain error occurred. The threshold for a finding of plain error is higher than that for harmless error: the doctrine "applies only where the substantial rights of the accused are affected and the claimed error create[s] grave doubts concerning the validity of the verdict." *State v. Salazar*, 2018-NMCA-030, ¶ 56, 458 P.3d 485 (internal quotation marks and citation omitted). And the testimony Defendant contends was subject to the spousal communications privilege does not cast doubt on the verdict. The testimony was that Defendant privately admitted to his wife that he had "do[ne] this," but

---

[2]Insofar as Defendant contends that it should matter here that Defendant's trial took place in a "low-population, rural area[] that [is] conservative and value[s] traditional religio[n,]" that argument fails. Defendant points to nothing in the record indicating that any of the empaneled jurors were likely to place especially heavy weight on the pastor's testimony because he was a pastor. And, even if he had, we would likely conclude that this did not affect the verdict because of the implausible explanation Defendant offered for his admission to his family.

the jury also heard testimony that he had made essentially the same admission to his assembled wife, son, and daughter-in-law, and it is highly improbable that the jury believed Defendant's explanation for this admission. We therefore hold that, assuming this issue is reviewable for plain error, no plain error occurred.[3]

### III.    The Doctrine of Cumulative Error Does Not Warrant Reversal

**{18}**    Finally, Defendant contends that cumulative error resulted from the combined effect of the admission of his wife's testimony regarding his statement to her alone and the admission of his communication to his pastor. We disagree. "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Salas*, 2010-NMSC-028, ¶ 39, 148 N.M. 313, 236 P.3d 32 (internal quotation marks and citation omitted). "In New Mexico the doctrine of cumulative error is strictly applied." *State v. Stills*, 1998-NMSC-009, ¶ 51, 125 N.M. 66, 957 P.2d 51 (internal quotation marks and citation omitted). Because we conclude that the admission of the pastor's testimony was harmless error and the additional persuasive effect, if any, of Defendant's wife's testimony regarding his first statement was minimal, we hold that no cumulative error occurred.

**CONCLUSION**

**{19}**    We affirm.

**{20}    IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**SHAMMARA H. HENDERSON, Judge**

---

3We decline to review Defendant's claim that his trial counsel's failure to assert the spousal privilege was ineffective because the record is inadequately developed to allow us to determine whether the spousal privilege applied to the statement at issue. Assuming a marriage existed at the time the statement was made, the record does not establish whether the statement amounted to "a confidential communication." Rule 11-505(B) NMRA. Unlike the record as to Defendant's statement to his pastor, the record as to Defendant's statement to his wife is silent on whether the statement was "not intended for further disclosure." Rule 11-505(A). Because we are unable to determine whether competent counsel would have asserted the privilege, Defendant has not made a prima facie case of ineffective assistance. We therefore decline to remand the case for an evidentiary hearing but note that Defendant may pursue his claim in a petition for a writ of habeas corpus. *See State v. Bernal*, 2006-NMSC-050, ¶ 33, 140 N.M. 644, 146 P.3d 289 (stating that when the record on appeal is inadequate to establish a prima facie case of ineffective assistance of counsel, our Supreme Court generally prefers that "such claims be brought and resolved through habeas corpus proceedings").