**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: May 23, 2016

**NO. 33,064**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**LAWRENCE BRANCH,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**William C. Birdsall, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Bauer, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**VANZI, Judge.**

{1} There is no question that Defendant Lawrence Branch shot and injured his adult son, Joshua Branch, with a .44 caliber revolver. Defendant confessed to the shooting and was charged with aggravated battery with a deadly weapon and negligent use of a deadly weapon. He was also charged with aggravated assault with a deadly weapon for allegedly assaulting his wife, Patricia Branch, on the theory that Defendant's conduct caused Patricia to reasonably believe that he was about to batter her as well. The key issue at trial was whether the shooting, which was the basis for all three charges, was in self defense.

{2} The jury ultimately convicted Defendant on all counts. Penalties for aggravated battery and aggravated assault were each increased by one year pursuant to the statutory firearm enhancement. NMSA 1978, § 31-18-16(A) (1993). The district court then adjudged the aggravated assault conviction to be a "serious violent offense," which limits Defendant's eligibility for good time credit for time served in a state prison. *See* NMSA 1978, § 33-2-34(A)(1) (2006, amended 2015).

{3} On appeal, Defendant argues that (1) insufficient evidence and instructional error require reversal of the aggravated assault conviction, (2) multiple punishments violate Defendant's right to be free from double jeopardy, (3) discovery and

evidentiary rulings undermined Defendant's ability to present a defense and to confront the State's evidence with respect to all charges, and (4) the serious violent offense designation to the aggravated assault conviction lacks necessary findings. We affirm in part, reverse in part, and remand for the district court to document its findings related to the serious violent offense designation.

**BACKGROUND**

{4}     By all accounts, Joshua and Defendant spent the morning of May 7, 2012, arguing in the front yard, as they often did, about how best to care for the property they occupied in separate trailers. Joshua, who was a college student in the spring of 2012, left in the middle of the argument to take an exam. The argument resumed upon his return and ended when Defendant fired a single shot, striking Joshua in the thigh. Joshua's injuries resulted in five surgeries and ongoing issues with circulation and limb function. He was on crutches when he testified for the State at trial a year later.

{5}     The specific circumstances surrounding the shooting were contested below. The State's witnesses testified that Defendant was visibly upset—"aggravated, agitated"—that morning. When Joshua finished his exam and returned to his parents' trailer, Defendant, with "hatred in his voice," told him to "get . . . off the property." The two then shouted back and forth before Joshua attempted to leave. Joshua and Patricia walked toward the concrete slab that surrounded the steps to the porch. He

had plans to meet his girlfriend for lunch, and Patricia, attempting to ease the tension, told him to do that. But as Joshua and Patricia talked near the front steps, Defendant walked past them into the house.

{6}    At some point prior, two guns—including a .44 caliber super blackhawk (described as a "hand cannon" by one witness)—were moved from their usual spot in a closet at the back of the trailer and stashed in Defendant's recliner, which faced the trailer's front entrance. Defendant armed himself with the .44 within seconds of entering the trailer and then walked back to the front door. Steven Hickman, a family friend who was visiting the Branch home that day, testified that Defendant "went to the door and then [said] 'get . . . out of here' and then bang, just like that, that quick, the gun was fired."

{7}    Patricia testified that she had her hand on Joshua's shoulder when he was shot. The two were facing one another when she looked up and saw Defendant standing in the doorway with the .44. She hollered, "No!" And Defendant fired. She saw the "fire come out" of the gun, felt something hit her leg, and saw Joshua fall. She testified that she "thought he was going to shoot all of us."

{8}    While Joshua lay bleeding on the pavement, Defendant came out of the trailer and placed a set of keys on the dash of a car that was parked under the carport. He then looked over to Patricia, turned, and walked up the road, stopping only to dispose

3

of his pocket knife in a flower pot on the way out. Patricia did not see Defendant again that day.

{9} Defendant's version of events differed in some respects. He testified that he was sitting with Patricia on a swing in the yard when Joshua returned from school. Defendant, who no longer wanted to argue, told Joshua that he would leave. When Defendant stood to do so, he saw that Joshua was furious. As Defendant walked toward the trailer, he saw Joshua and Patricia coming toward him. He entered the house and saw Joshua outside, nearing the porch and then reaching for the rail by the door. Defendant was frightened because he knew that Joshua was a "violent kid" with post traumatic stress disorder (PTSD) who had been in several fights before, including a fight in the military. He armed himself with the .44 and shot Joshua, who then released the rail and fell to the concrete. Additional facts will be included as needed in the analysis that follows.

**DISCUSSION**

**A.    Instructional Error and Sufficiency of the Evidence**

{10} Assault consists of "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery[.]" NMSA 1978, § 30-3-1(B) (1963). The offense is aggravated when, as in this case, it is committed with a deadly weapon. NMSA 1978, § 30-3-2(A) (1963).

4

Defendant argues that Section 30-3-1(B) required the State to prove something more than general criminal intent, which was the instruction given to the jury. Specifically, Defendant argues that the State had to prove "specific intent to frighten or put someone in fear of an imminent battery[,]" or at the very least, that one charged with violating Section 30-3-1(B) did so recklessly. Reading limiting principles of this sort into the statute would theoretically ensure some nexus between a defendant and his victim, thereby preventing what might otherwise amount to a construction of the assault statute that criminalizes the infliction of emotional distress for every bystander that is reasonably put in fear by the commission of a nearby crime.

{11}     Defendant's argument is characterized as a sufficiency of the evidence challenge, as a challenge to the jury instructions themselves, and as an assertion of ineffective assistance of trial counsel in failing to request more demanding jury instructions. "Our review for sufficiency of the evidence is deferential to the jury's findings. We review direct and circumstantial evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Webb*, 2013-NMCA-027, ¶ 14, 296 P.3d 1247 (alteration, internal quotation marks, and citations omitted). With respect to jury instructions, we review for reversible error when an instruction is preserved and for fundamental error when not. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258,

5

34 P.3d 1134. Whether preserved or not, however, Defendant's contention ultimately raises an issue of statutory interpretation, for which our review is de novo. *State v. Tafoya*, 2012-NMSC-030, ¶ 11, 285 P.3d 604; *see also State v. Osborne*, 1991-NMSC-032, ¶ 40, 111 N.M. 654, 808 P.2d 624 ("[I]t is the duty of the court, not the defendant, to instruct the jury on the essential elements of a crime.").

{12}     Defendant's view of Section 30-3-1(B) has some merit. At common law, "[a] criminal assault was an attempt to commit a battery. A tortious assault was an act which put another in reasonable apprehension of immediate bodily harm." *United States v. Dupree*, 544 F.2d 1050, 1051 (9th Cir. 1976) (per curiam) (citation omitted). The latter type—reasonable apprehension assault—has since been made a crime in many jurisdictions, which have normally adopted specific intent requirements rooted in the offense's history as an intentional tort. *Carter v. Commonwealth*, 594 S.E.2d 284, 287-88 (Va. Ct. App. 2004); *see, e.g.*, *Robinson v. United States*, 506 A.2d 572, 575 (D.C. 1986) ("An intent to frighten is sufficient[.]"); *Lamb v. State of Maryland*, 613 A.2d 402, 413 (Md. Ct. Spec. App. 1992) ("An assault of the intentional frightening variety . . . requires a specific intent to place the victim in reasonable apprehension of an imminent battery."); *Commonwealth v. Spencer*, 663 N.E.2d 268, 271 (Mass. App. Ct. 1996) ("[P]roof of an intent to cause fear is required."); *accord* Model Penal Code § 211.1(1)(c) (2015) ("A person is guilty of assault if he . . .

6

attempts by physical menace to put another in fear of imminent serious bodily injury."). This apparent uniformity in other jurisdictions has prompted one leading treatise to categorically declare that "[t]here must be an actual intention to cause apprehension, unless there exists the morally worse intention to cause bodily harm." 2 Wayne R. LaFave & David C. Baum, *Substantive Criminal Law* § 16.3(b), at 569 (2d ed. 2003).

{13} But that is not the law of New Mexico. In *State v. Cruz,* this Court held that specific intent is not an essential element of aggravated assault. 1974-NMCA-077, ¶ 7, 86 N.M. 455, 525 P.2d 382. As a principle of construction, when a statute does not refer to intent, which is the case with Section 30-3-1(B), we normally presume that the only mens rea involved is that of conscious wrongdoing—commonly referred to as "general criminal intent." *State v. Campos*, 1996-NMSC-043, ¶ 56, 122 N.M. 148, 921 P.2d 1266 (Franchini, J., dissenting). We applied that presumption to aggravated assault in *Cruz*, and in *State v. Cutnose*, 1974-NMCA-130, ¶¶ 19-20, 87 N.M. 307, 532 P.2d 896. *Cf. State v. Mascarenas*, 1974-NMCA-100, ¶¶ 11-12, 86 N.M. 692, 526 P.2d 1285 ("[I]nstructions in the language of the statute sufficiently instruct on the required intent.").

{14} In *State v. Manus*, our Supreme Court—apparently persuaded by that reasoning—confirmed that general criminal intent is all that is required to support a

7

conviction of aggravated assault under Section 30-3-1(B). *State v. Manus*, 1979-NMSC-035, ¶ 12, 93 N.M. 95, 597 P.2d 280, *overruled on other grounds by Sells v. State*, 1982-NMSC-125, ¶¶ 9-10, 98 N.M. 786, 653 P.2d 162. The arguments made in *Manus*, which was also a bystander-assault case, are nearly identical to those presented here. A police officer and a bystander were filling out an accident report when the defendant approached and killed the officer with a shotgun. *Id.* ¶ 3. The defendant was charged with killing the officer and assaulting the bystander on the theory that the bystander was put in reasonable fear of receiving an immediate battery. *Id.* ¶¶ 1, 14.

{15} The defendant argued that his conviction for aggravated assault of the bystander could not stand because "there was no evidence of any intentional assault directed at [her]." *Id.* ¶ 12. Our Supreme Court rejected that argument, holding that "[t]he [s]tate was not required to prove that [the defendant] intended to assault [the bystander], but only that he did an unlawful act which caused [the bystander] to reasonably believe that she was in danger of receiving an immediate battery, that the act was done with a deadly weapon, and that it was done with general criminal intent." *Id.* ¶ 14; *see State v. Morales*, 2002-NMCA-052, ¶ 36, 132 N.M. 146, 45 P.3d 406 ("To convict [the d]efendant of aggravated assault on a peace officer, the [s]tate was not required to prove that [the d]efendant intended to injure or even frighten [the

8

officer].”), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110; *see also United States v. Rede-Mendez*, 680 F.3d 552, 557 (6th Cir. 2012) (“The New Mexico version of aggravated assault differs from the generic version most significantly in the mens rea it attaches to the element of bodily injury or fear of injury.”); *United States v. Silva*, 608 F.3d 663, 675 (10th Cir. 2010) (Hartz, J., dissenting) (“[A] person [in New Mexico] who intentionally handles a weapon in a manner that induces a fear of battery can be guilty of assault even if he merely wants to show off his dexterity in handling the weapon, without any interest in inducing fear.”).

{16} The expansive application of assault in *Manus* controls our construction of Section 30-3-1(B). In accordance with the language of the statute, the State was only required to prove that Defendant “did an unlawful act which caused [the bystander] to reasonably believe that she was in danger of receiving an immediate battery, that the act was done with a deadly weapon, and that it was done with general criminal intent.” *Manus*, 1979-NMSC-035, ¶ 14. There is no nexus required between Defendant and Patricia. Liability under the statute is only limited by the requisite mental state of conscious wrongdoing and by the requirement that the victim’s fear must be reasonable. *See id.*

9

{17}     Evidence was presented that Defendant's behavior on the day of the shooting was generally threatening. He was "aggravated, agitated at something" on that day; he had "hatred in his voice." He was in the midst of an ongoing argument with Joshua that had taken a turn for the worse. He spent the morning acting erratically—driving around the yard on a backhoe, threatening to "plow Joshua's house down." He demanded that Patricia choose between him and Joshua, but she refused to do so. His demeanor prior to the shooting frightened Patricia.

{18}     According to his own version of events, Defendant ascended the porch steps and saw Joshua coming toward the trailer with Patricia "behind him." Steven and Patricia testified that Defendant armed himself within "a couple of seconds" and shot Joshua while Patricia was standing right next to him. Patricia testified that she saw the muzzle flash, felt something hit her leg, and "thought he was going to shoot all of us." We view this testimony in the light most favorable to the State. *See Webb*, 2013-NMCA-027, ¶ 14. While Defendant's version of events differs in some respects, it was for the jury to weigh the credibility of the witnesses and resolve any conflicts in the testimony. *See id.* The jury could conclude that Defendant committed an unlawful act (shooting Joshua), which caused Patricia—who had witnessed the day's events and was "standing right next to" Joshua when the shooting occurred—to reasonably believe that she was also going to be shot. The jury was properly

instructed on general criminal intent. Nothing more is required. *See Manus*, 1979-NMSC-035, ¶ 14.

{19} Defendant makes one additional (and related) argument with respect to the sufficiency of the evidence for the aggravated assault conviction. He contends that the evidence failed to establish that he made any threat or exhibited any menacing conduct toward Patricia, which he argues is required by the statute. Defendant misreads Section 30-3-1(B). Assault consists of "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery[.]" *Id.* The commission of an "unlawful act" is an alternative method of committing the offense that does not rely on threatening or menacing conduct. *See Hale v. Basin Motor Co.*, 1990-NMSC-068, ¶ 9, 110 N.M. 314, 795 P.2d 1006 ("[T]he word 'or' should be given its normal disjunctive meaning unless the context of a statute demands otherwise."). It was, in fact, the prong of the statute applied in *Manus*, where the state was not required to prove any threat—or any conduct at all—directed toward the bystander. 1979-NMSC-035, ¶ 14. There is abundant evidence to support a finding that Defendant acted unlawfully when he shot Joshua.

## B. Double Jeopardy

{20} We next turn to the various double jeopardy issues that Defendant raises. The constitution protects against both successive prosecutions and multiple punishments for the same offense. *Swafford v. State*, 1991-NMSC-043, ¶ 6, 112 N.M. 3, 810 P.2d 1223. There are two types of multiple punishment cases: (1) unit of prosecution cases, in which an individual is convicted of multiple violations of the same criminal statute; and (2) double-description cases, in which a single act results in multiple convictions under different statutes. *Id.* ¶¶ 8-9. Defendant's arguments, involving separate statutes, raise only double-description concerns.

{21} Our courts apply a two-step inquiry to double-description claims. *Id.* ¶ 25. First, we analyze the factual question, "whether the conduct underlying the offenses is unitary, *i.e.*, whether the same conduct violates both statutes[,]" and if so, we consider the legal question, "whether the [L]egislature intended to create separately punishable offenses." *Id.* "If it reasonably can be said that the conduct is unitary, then [we] must move to the second part of the inquiry. Otherwise, if the conduct is separate and distinct, [the] inquiry is at an end." *Id.* ¶ 28.

{22} Because it is undisputed that this case involves unitary conduct (the firing of a single shot) that resulted in multiple convictions, our analysis will be limited to the question of legislative intent. "Determinations of legislative intent, like double

12

jeopardy, present issues of law that are reviewed de novo, with the ultimate goal of such review to be facilitating and promoting the [L]egislature's accomplishment of its purpose." *State v. Montoya*, 2013-NMSC-020, ¶ 29, 306 P.3d 426 (alterations, internal quotation marks, and citation omitted). When, as here, the statutes themselves do not expressly provide for multiple punishments, we begin by applying the rule of statutory construction from *Blockburger v. United States*, 284 U.S. 299 (1932), to determine whether each provision requires proof of a fact that the other does not. *Swafford*, 1991-NMSC-043, ¶¶ 10, 30. If not, one offense is logically subsumed within the other, and "punishment cannot be had for both." *Id.* ¶ 30.

{23}     In *State v. Gutierrez*, our Supreme Court modified the *Blockburger* analysis for double jeopardy claims involving statutes that are "vague and unspecific" or "written with many alternatives." 2011-NMSC-024, ¶¶ 58-59, 150 N.M. 232, 258 P.3d 1024 (emphasis, internal quotation marks, and citation omitted). Accordingly, "the application of *Blockburger* should not be so mechanical that it is enough for two statutes to have different elements." *State v. Swick*, 2012-NMSC-018, ¶ 21, 279 P.3d 747. That is, we no longer apply a strict elements test in the abstract; rather, we look to the state's trial theory to identify the specific criminal cause of action for which the defendant was convicted, filling in the case-specific meaning of generic terms in the statute when necessary. *Gutierrez*, 2011-NMSC-024, ¶¶ 58-59. We do so

13

"independent of the particular facts of the case . . . by examining the charging documents and the jury instructions given in the case." *Swick*, 2012-NMSC-018, ¶ 21.

{24} If the statutes survive *Blockburger*, we examine "other indicia of legislative intent." *Swafford*, 1991-NMSC-043, ¶ 31. We look to "the language, history, and subject of the statutes, and we must identify the particular evil sought to be addressed by each offense." *Montoya*, 2013-NMSC-020, ¶ 32 (internal quotation marks and citation omitted). "Statutes directed toward protecting different social norms and achieving different policies can be viewed as separate and amenable to multiple punishments." *Swafford*, 1991-NMSC-043, ¶ 32.

{25} Defendant argues that his right to be free from double jeopardy is violated by multiple punishments for (1) aggravated battery and negligent use of a firearm, (2) aggravated assault and aggravated battery, and (3) the firearm enhancements to aggravated assault and aggravated battery. The State concedes at the outset that Defendant's conviction for negligent use of a firearm must be vacated, because—as charged—it is subsumed within the aggravated battery conviction. We agree. We address Defendant's two remaining arguments in turn.

**1. Aggravated Assault and Aggravated Battery**

{26} The charge of aggravated assault with a deadly weapon was apparently pursued under the "unlawful act" prong of Section 30-3-1(B). The term "any unlawful act" is

14

a generic one; there are numerous forms of conduct that could fulfill that requirement. *See Mascarenas*, 1974-NMCA-100, ¶ 14 (" 'Unlawful' may mean nothing more than 'not authorized by law.' "). In applying *Blockburger*, we identify the State's actual theory of the case to supply the case-specific meaning of generic statutory terms. *Gutierrez*, 2011-NMSC-024, ¶¶ 58-59. The "unlawful act" that was charged to the jury was that Defendant "shot Joshua Branch while Patricia Branch was standing next to him[.]"

{27}    Defendant's conviction for aggravated battery, on the other hand, required the State to prove "the unlawful touching or application of force to the person of another *with intent to injure that person or another*." NMSA 1978, § 30-3-5(A) (1969) (emphasis added). Section 30-3-5(A) always includes a statutory element (intent to injure another person) that is never an element of assault under Section 30-3-1(B), even as charged in this case. That is because—as we have discussed at length in this Opinion—assault under Section 30-3-1(B) has no specific intent requirement. *Manus*, 1979-NMSC-035, ¶ 14. Similarly, assault under Section 30-3-1(B) always includes an element (the victim's reasonable belief that battery is imminent) that is never required to commit a battery. *See In re Marlon C.*, 2003-NMCA-005, ¶ 12, 133 N.M. 142, 61 P.3d 851 ("It is theoretically possible to complete a battery on a person without prior conduct causing the person to believe the person is about to be battered,

15

for example, if the person is struck from behind."). Therefore, one offense is not subsumed within the other, and *Blockburger* alone does not foreclose punishment under both statutes.

{28}    When two statutes survive *Blockburger*, we look to "the language, history, and subject of the statutes, and we must identify the particular evil sought to be addressed by each offense." *Montoya*, 2013-NMSC-020, ¶ 32 (internal quotation marks and citation omitted). "[T]he social evils proscribed by different statutes must be construed narrowly[.]" *Swafford*, 1991-NMSC-043, ¶ 32. "The aggravated battery statute protects against the social evil that occurs when one person intentionally physically attacks and injures another." *State v. Carrasco*, 1997-NMSC-047, ¶ 33, 124 N.M. 64, 946 P.2d 1075 (internal quotation marks and citation omitted). The culpable act under Section 30-3-1(B), on the other hand, is one that causes apprehension or fear. In other words, "[t]he harm related to assault is mental harm; assaults put persons in fear. The harm related to battery is physical harm; batteries actually injure persons." *State v. Cowden*, 1996-NMCA-051, ¶ 12, 121 N.M. 703, 917 P.2d 972.

{29}    In *State v. Roper*, we held that double jeopardy principles are not offended when a defendant is convicted and sentenced for two counts of assault for pointing a gun at two persons at the same time. 2001-NMCA-093, ¶ 12, 131 N.M. 189, 34 P.3d

16

133. The analysis in *Roper* is consistent with the principle that our assault statutes are designed to protect distinct victims from mental harm caused by a single act. *Id.*; *Cowden*, 1996-NMCA-051, ¶ 12. Although this is not a unit of prosecution case, the same logic applies here, where one victim is shot and another assaulted. Defendant's convictions for offenses involving distinct social harms caused to multiple victims do not violate the right to be free from double jeopardy.

**2.      Firearm Enhancements**

{30}      Defendant next argues that firearm enhancements to his convictions for aggravated battery and aggravated assault, both committed with a deadly weapon, violate double jeopardy because use of a firearm—the only essential requirement for the increased penalty—was also charged to the jury to prove the underlying crimes. The law in this area is not clear.

{31}      A sentence shall be increased by one year when a court or jury makes a separate finding of fact that a firearm was used in the commission of a noncapital felony. Section 31-18-16(A). We have previously held that the firearm enhancement can be constitutionally applied to both aggravated battery with a deadly weapon, *State v. Gonzales*, 1981-NMCA-023, ¶ 6, 95 N.M. 636, 624 P.2d 1033, *overruled on other grounds by Buzbee v. Donnelly*, 1981-NMSC-097, ¶ 46, 96 N.M. 692, 634 P.2d 1244, and aggravated assault with a deadly weapon, *State v. Charlton*, 1992-NMCA-124,

¶¶ 23, 26, 115 N.M. 35, 846 P.2d 341. In some instances, we have upheld the enhancement even when the jury instruction for the underlying offense expressly required the state to prove that the deadly weapon used was, in fact, a firearm. *See, e.g.*, *State v. Gonzales*, 2010 WL 4924986, No. 28,467, mem. op. *11 (N.M. Ct. App. Oct. 26, 2010) (non-precedential). The State cites these cases in support of its argument. Defendant counters in his reply brief that *Gonzales* and *Charlton* (and other similar cases) are no longer good law on this point.

{32}     *Gonzales* relied entirely on *State v. Gabaldon*, 1978-NMCA-101, 92 N.M. 230, 585 P.2d 1352. In *Gabaldon*, we upheld a firearm enhancement applied to a conviction of robbery with a deadly weapon, where the deadly weapon used was a firearm because armed robbery could (in theory) be committed by using a knife, brass knuckles, or any other deadly weapon. *Id.* ¶¶ 1, 28, 31. Since the statutory elements for armed robbery did not always require proof that a firearm was used, there was no double jeopardy violation. *Id.* ¶ 31. *Charlton* similarly resolved the *Blockburger* portion of the double jeopardy analysis by looking strictly to the elements of the statutes. *Charlton*, 1992-NMCA-124, ¶¶ 22-23.

{33}     Thus, there is a natural distinction in cases where the elements of the enhanced offense specifically refer to the use of a "firearm" as opposed to a "deadly weapon." *State v. Varela*, 1999-NMSC-045, ¶ 41, 128 N.M. 454, 993 P.2d 1280 (vacating

18

firearm enhancements applied to a conviction for shooting into a dwelling and for felony murder predicated on that offense because the use of a firearm is an element of the crimes); *State v. Franklin*, 1993-NMCA-135, ¶ 15, 116 N.M. 565, 865 P.2d 1209 (distinguishing *Gabaldon* because the defendant in *Franklin* was specifically charged with manslaughter by negligent use of a firearm). As we recognized in *Franklin*, the state is not required to prove any additional facts to enhance the sentence when use of a firearm—as opposed to a deadly weapon—is an express statutory element of the enhanced offense. 1993-NMCA-135, ¶¶ 13-15. In those instances, the firearm enhancement has always been subsumed under *Blockburger* (even when applied to the statutes in the abstract), and punishment cannot be had for both the enhancement and the enhanced offense. *Franklin*, 1993-NMCA-135, ¶¶ 13-15.

{34} The basis for the distinction between *Charlton* and *Gonzales*, on the one hand, and *Varela* and *Franklin*, on the other, is no longer sound. Our Supreme Court's subsequent rejection of a mechanical, strict elements test in cases involving statutes that are "vague and unspecific" or "written with many alternatives" now requires our courts to apply *Blockburger* with reference to the state's legal theory of the case. *Gutierrez*, 2011-NMSC-024, ¶¶ 58-59 (emphasis, internal quotation marks, and citation omitted).

{35}    A "deadly weapon" is a generic term. As defined in the Criminal Code, it "means any firearm, whether loaded or unloaded; or any weapon which is capable of producing death or great bodily harm[.]" NMSA 1978, § 30-1-12(B) (1963). The definition then includes a nonexclusive list of various weapons, including brass knuckles, switchblade knives, etc. *Id.* Although the deadly weapon required to commit aggravated battery and aggravated assault could have technically been any of these weapons, *see Gabaldon*, 1978-NMCA-101, ¶¶ 28, 31, there is no doubt that the State sought to prove that the deadly weapon actually used in this case was a firearm.

{36}    To determine the State's theory of the case, we look to the charging documents and jury instructions. *See Swick*, 2012-NMSC-018, ¶ 21. For aggravated battery with a deadly weapon, Defendant was charged by criminal information with "touch[ing] or apply[ing] force to Joshua Branch, with a .44 caliber revolver handgun, a deadly weapon." To convict him of that offense, the jury was charged to find that Defendant "touched or applied force to Joshua Branch by shooting him with a firearm[.]" For aggravated assault with a deadly weapon, Defendant was charged with "assault[ing] . . . Patricia Branch with a .44 caliber revolver[,] a deadly weapon[.]" The jury instruction on that count required a finding that Defendant "shot Joshua Branch." In light of the theory of the case charged to the jury, we can no longer

20

examine the elements of the assault and battery statutes in the abstract to uphold the firearm enhancements as we did in *Charlton* and *Gonzales*. *See Swick*, 2012-NMSC-018, ¶ 21; *Gutierrez*, 2011-NMSC-024, ¶¶ 58-59.

{37} Our Supreme Court's most recent pronouncement on this issue was in an unpublished decision. *State v. Ferri*, 2015 WL 560798, No. 34,229, dec. ¶¶ 66-67 (N.M. Sup. Ct. Feb. 9, 2015) (non-precedential). The Court concluded that, when use of a firearm was specifically instructed as an element of the aggravated burglary offense, which similarly refers to the generic "deadly weapon" element, the inclusion of a firearm enhancement violates double jeopardy. *Id.* ¶¶ 1, 66-67. The result in *Ferri*, which is persuasive authority, *see* Rule 12-405(A) NMRA, is not consistent with *Gabaldon*'s abstract analysis of the "deadly weapon" element of armed robbery, upon which *Charlton* and *Gonzales* relied. *Gabaldon*, 1978-NMCA-101, ¶¶ 1, 29-31.

{38} Because the State, according to its own theory of the case, was not required to prove any additional facts to have Defendant's sentence enhanced, the firearm enhancements in this case violate double jeopardy under the rule stated in *Varela* and *Franklin* just as they would if the statutes themselves said "firearm" instead of "deadly weapon." The enhancements must be vacated.

## C.    Discovery and Evidentiary Rulings

{39}    Defendant next argues that discovery and evidentiary rulings undermined his right to present a defense and to confront the State's evidence. He argues that the district court erred when it (1) failed to order disclosure of Joshua's military and mental health records, (2) excluded expert testimony related to PTSD, and (3) failed to provide a remedy for the destruction of evidence material to the case. Defendant asserts that these errors, either separately or combined, deprived him of a fair trial.

{40}    We review these contentions in a manner highly deferential to the court below. "The granting of discovery in a criminal case is a matter peculiarly within the discretion of the trial court. A trial judge's denial of a defendant's discovery requests will be reviewed according to an abuse of discretion standard." *State v. Bobbin*, 1985-NMCA-089, ¶ 7, 103 N.M. 375, 707 P.2d 1185 (citation omitted). The same standard applies in evaluating a trial court's decision to exclude evidence, *State v. Stills*, 1998-NMSC-009, ¶ 44, 125 N.M. 66, 957 P.2d 51, and in evaluating a trial court's ruling as to the proper remedy for evidence that has been lost or destroyed, *State v. Chouinard*, 1981-NMSC-096, ¶¶ 25-26, 96 N.M. 658, 634 P.2d 680. "An abuse of discretion arises when the evidentiary ruling is clearly contrary to logic and the facts and circumstances of the case." *State v. Downey*, 2008-NMSC-061, ¶ 24, 145 N.M. 232, 195 P.3d 1244 (internal quotation marks and citation omitted).

22

**1.      Disclosure of Military and Mental Health Records**

{41}    Defendant issued a subpoena duces tecum directing Joshua, who is a veteran of the Marine Corps, to provide a copy of his military discharge paperwork. Defendant also requested a court order authorizing the release of Joshua's discharge records from the National Archives in St. Louis, Missouri. *See* 5 U.S.C. § 552a(b)(11) (2014) (permitting the disclosure of agency records "pursuant to the order of a court of competent jurisdiction"). In response, the State asserted that Joshua's discharge records were inadmissible and contained sensitive personal identifying information and protected medical information. The State also asserted that Joshua's prior service as a Marine could not possibly provide a justification for Defendant shooting him in the leg.

{42}    At the hearing on the issue, the district court apparently viewed Defendant's various discovery requests as a "fishing expedition."[1] The court asked Defendant to articulate his reasons for seeking Joshua's military records. Defendant asserted that Joshua had been previously involved in "violence against other members of the military." Defendant specifically referred to a fight in the military that may have resulted in Joshua's service being prematurely terminated. He argued that evidence of the fight could be admissible to show Joshua's propensity for violence. He also

[1]Defendant also subpoenaed Joshua's college academic records. That subpoena is not involved in this appeal.

argued that Joshua was going to take the stand and that the discharge papers would be useful to impeach him. And finally, Defendant argued that the military records could open an avenue into Joshua's mental health history as it relates to PTSD.

{43}     The district court correctly determined that, in self defense cases, evidence of specific instances of a victim's prior violent conduct cannot be admitted as propensity evidence of the victim's violent disposition. *See State v. Armendariz*, 2006-NMSC-036, ¶ 17, 140 N.M. 182, 141 P.3d 526 ("[A] victim's violent character is not an essential element of a defendant's claim of self[]defense, but rather circumstantial evidence that tends to show that the victim acted in conformity with his or her character on a particular occasion. . . . [O]nly reputation or opinion evidence should be admitted to show that the victim was the first aggressor."), *overruled on other grounds by Swick*, 2012-NMSC-018, ¶ 31. The district court also recognized that the discharge papers would not be admissible to impeach Joshua. *See* Rule 11-608(B) NMRA ("[E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."). Because the requested records allegedly contained Joshua's "sacrosanct" medical history, and because Defendant did not justify the need for those records at the hearing, the district court quashed Defendant's subpoena and declined

to issue an order authorizing production of the documents from the National Archives.

{44} Records are normally discoverable if reasonably calculated to lead to the discovery of admissible evidence. *See* Rule 5-503(C) NMRA. While records need not be admissible to be discoverable, a proponent of discovery may still be required to provide "a reasonable basis on which to believe that it is likely the records contain material information." *State v. Garcia*, 2013-NMCA-064, ¶ 28, 302 P.3d 111. Defendant argues on appeal that the proper procedure to determine materiality of Joshua's military records would have been for the district court to order in camera review of the documents.

{45} We agree that in camera review would have been the best way to balance Joshua's privacy interests with Defendant's interests in obtaining records that were potentially relevant to his defense. *See State v. Luna*, 1996-NMCA-071, ¶ 13, 122 N.M. 143, 921 P.2d 950 ("In camera review of confidential information represents a compromise between the intrusive disclosure of irrelevant information on the one hand and the complete withholding of possibly exculpatory evidence on the other."); *State v. Gonzales*, 1996-NMCA-026, ¶ 20, 121 N.M. 421, 912 P.2d 297 (stating that the proper procedure to determine whether the material requested by the defendant is relevant is in camera review by the district court); *State v. Pohl*, 1976-NMCA-089,

¶ 5, 89 N.M. 523, 554 P.2d 984 (holding that the district court erred in not conducting an in camera review "to determine whether the files contained evidence material to the defense").

{46} But there is one problem for Defendant. Unlike the defendants in *Luna*, 1996-NMCA-071, ¶ 3, *Gonzales*, 1996-NMCA-026, ¶ 20, and *Pohl*, 1976-NMCA-089, ¶ 4, Defendant never actually requested in camera inspection of any records before the district court—even after the court asked Defendant to provide "specific knowledge . . . as to what to look for and where, or on the other hand *to request an in camera review*[.]" For that reason alone, this case better resembles *State v. Baca*, in which we stated,

> As in *Pohl*, we cannot determine whether the suppressed evidence was material to [the d]efendants' claim of self[]defense, but, unlike *Pohl*, [the d]efendants neither requested an in camera hearing nor showed as specific a need as could be expected under the circumstances. . . . Rather, our review of the argument made during the motion hearing convinces us that [the d]efendants were on a fishing expedition. [The d]efendants made no showing that their rights would be violated but for full disclosure of the master file[.]

1993-NMCA-051, ¶¶ 25-26, 115 N.M. 536, 854 P.2d 363 (internal quotation marks and citations omitted).

{47} There are compelling arguments on appeal that in camera review of Joshua's military records could have been useful to locate material information, such as the identities of character witnesses who could have testified about Joshua's reputation

for violence, *see* Rule 11-405(A) NMRA, or corroborating witnesses who arguably could have testified under Rule 11-404(B) NMRA and *State v. Maples*, 2013-NMCA-052, ¶ 27, 300 P.3d 749. But we cannot say that the district court abused its discretion in rejecting the arguments that were actually presented below, where Defendant did not seek in camera review but sought full disclosure of all discharge records. *See Baca*, 1993-NMCA-051, ¶¶ 25-26; *see also State v. Ortiz*, 2009-NMCA-092, ¶ 32, 146 N.M. 873, 215 P.3d 811 ("To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." (internal quotation marks and citation omitted)). We affirm the district court because its ruling on the arguments before it was not "clearly contrary to logic and the facts and circumstances of the case." *Downey*, 2008-NMSC-061, ¶ 24 (internal quotation marks and citation omitted).

**2.     Testimony Related to PTSD**

{48}     Defense counsel questioned Joshua at a preliminary hearing about a diagnosis of PTSD related to prior military service. The State then filed a motion in limine to exclude evidence of Joshua's mental health history in the absence of expert testimony establishing the relevance of such evidence. The district court granted that motion, ordering that if "Defendant does not make, through expert testimony, a *prima faci*[*e*] showing that evidence of [Joshua's] mental health history is relevant, then no such

27

evidence may be introduced." A little over a week before trial, Defendant identified Dr. Alexander Paret, a psychologist, to testify about PTSD. The State moved to exclude Dr. Paret's testimony on the ground that he had no prior contact with Joshua and would have been unable to testify about how PTSD symptoms were specifically manifested in Joshua.

{49} The district court held a hearing on the issue on the day before trial. Defendant conceded that Dr. Paret had never met or spoken with Joshua and would only testify about PTSD generally because a diagnosis of PTSD goes to the reasonableness of Defendant's assumption that he was in apparent danger when he shot Joshua. The court pointed out that "PTSD is a spectrum" that manifests itself in different people in different ways and that without ever having examined Joshua, Dr. Paret could not assist the jury in determining whether Defendant's alleged concerns about Joshua's PTSD were reasonable. The court suppressed the proposed testimony.

{50} "The very essence of discretion is that there will be reasons for the district court to rule either way on an issue, and whatever way the district court rules will not be an abuse of discretion." *State v. Layne*, 2008-NMCA-103, ¶ 7, 144 N.M. 574, 189 P.3d 707. "The trial judge's discretion is necessarily broad for he sits in the arena of litigation." *State v. Tafoya*, 1980-NMSC-099, ¶ 6, 94 N.M. 762, 617 P.2d 151 (internal quotation marks and citation omitted). It is the trial judge that is best suited

28

to answer the determinative question: "On this subject can a jury from this person receive appreciable help?" *Id.* (internal quotation marks and citations omitted).

{51} The defendant in *Tafoya* was prevented from calling a child psychologist to testify that children had fantasized an alleged instance of sexual assault. *Id.* ¶ 3. The psychologist's testimony "was to have been based upon statements and depositions of the children, as well as tapes of their trial testimony. She had never personally observed the demeanor of the children, nor questioned them herself." *Id.* On appeal, our Supreme Court held that it was not an abuse of discretion for the trial court to "determine that the probative value of the testimony was slight, based upon the lack of personal observation" by the psychologist. *Id.* ¶ 7.

{52} The situation is no different here. The district court in this case reasonably discounted the value of Dr. Paret's general testimony about PTSD, which would have made no reference to any observation of Joshua. "PTSD is simply not a monolithic disease with a uniform structure that does not permit of individual variation." *Brunell v. Wildwood Crest Police Dep't*, 822 A.2d 576, 588-89 (N.J. 2003). Those diagnosed with PTSD exhibit a range of reactions related to their trauma. *See* The National Institute of Mental Health: Post-Traumatic Stress Disorder, *available at* http://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd/index.s html (last accessed April 20, 2016). Dr. Paret's proposed testimony would not have

29

accounted for any individual variation or meaningfully assisted the jury in determining whether Defendant's reaction to the manifestation of PTSD *in Joshua* was reasonable. "No error occurs when the judge excludes expert testimony where the probative value of that testimony is slight." *State v. Blea*, 1984-NMSC-055, ¶ 7, 101 N.M. 323, 681 P.2d 1100. The cases cited by Defendant are not to the contrary. *State v. Alberico*, 1993-NMSC-047, ¶ 44, 116 N.M. 156, 861 P.2d 192 ("[T]he relevant inquiry is on *this subject* can a jury from *this person* receive appreciable help." (alteration, internal quotation marks, and citation omitted)); *State v. Marquez*, 2009-NMSC-055, ¶ 25, 147 N.M. 386, 223 P.3d 931 (dealing with harmless error in an analysis that has been overruled), *overruled by Tollardo*, 2012-NMSC-008.

**3.  Destruction of Evidence**

{53}  At some point on the day of the shooting, Detective Danny Clugsten of the San Juan County Sheriff's Office took photographs of the crime scene that were inadvertently lost. Defendant moved on the morning of trial to dismiss all charges or to otherwise exclude several of the State's witnesses pursuant to *Scoggins v. State*, 1990-NMSC-103, ¶¶ 8-9, 111 N.M. 122, 802 P.2d 631. In the alternative, Defendant requested a last-minute continuance so that the State could review and respond to the authorities cited in the motion to dismiss. The district court denied the motion because it was not timely and because there were multiple eyewitnesses at the scene

who could testify about the relevant details. Defendant subsequently requested a jury instruction that the lost photographs "may have supported the conclusion that Joshua Branch was in a position from which he could cause immediate harm to . . . [D]efendant" and that the jury could consider the loss of evidence to be "unfavorable to the [S]tate." The court gave defense counsel carte blanche to raise the issue in cross-examination of police witnesses and in closing arguments but denied the request for a limiting instruction.

{54}     We apply a three-part test to determine whether deprivation of evidence by the State constitutes reversible error. *Chouinard*, 1981-NMSC-096, ¶ 16. We ask, first, whether the State breached some duty or intentionally deprived Defendant of evidence; second, whether the suppressed evidence was material; and third, whether prejudice resulted. *Id.* Because there is no allegation that the photographs were lost in bad faith, Defendant bore the burden of showing materiality and prejudice before any sanctions would have been appropriate. *See State v. Pacheco*, 2008-NMCA-131, ¶ 30, 145 N.M. 40, 193 P.3d 587. The district court is in the best position to evaluate the importance of lost evidence. *Id.*

{55}     Defendant's motion was filed at the last minute and without any good reason for the late filing. The defense team had known for months that the photographs were lost. They nevertheless brought the issue to the court's attention on the morning of

trial because, after a discussion the night before, they realized they "had a duty to generate a record." They faxed the motion to opposing counsel at 7:00 p.m. that night, leaving the State little opportunity to respond. It was undisputed that the motion was untimely and that there was no good excuse for the late filing.

{56} In any event, Defendant's argument is not convincing on the merits. While there is no doubt that the State breached a duty to preserve evidence, the district court could reasonably conclude that Defendant did not show materiality or prejudice. Defendant asserted at the hearing that blood spatter in the photographs might show Joshua's location when he was shot. That is speculative because Defendant did not know what was in the photographs. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *State v. Martin*, 1984-NMSC-077, ¶ 37, 101 N.M. 595, 686 P.2d 937 (internal quotation marks and citation omitted). It was, after all, Defendant's burden to establish materiality. *Pacheco*, 2008-NMCA-131, ¶ 30. And that burden might have been met had the defense team addressed the issue when the State brought it to their attention months earlier. The photos were taken and lost by an identified officer, Detective Clugston. There were likely two other witnesses, Deputy Todd Mangan, the first officer that arrived on the scene, and Detective Tim Nyce, who stated in open court that he was

32

present when the photos were taken, that could have testified about the nature of the lost evidence. But instead of interviewing them prior to filing the motion, defense counsel speculated on the morning of trial about the contents of the photographs, asking—based on the unknown—for outright dismissal of all charges, exclusion of several of the State's witnesses, or a continuance of the trial after the jury had already been empaneled. *See State v. Aragon*, 1997-NMCA-087, ¶ 22, 123 N.M. 803, 945 P.2d 1021 ("[A]s a general rule, a motion for a continuance filed at the last minute is not favored.").

{57} Even assuming that there was discernable blood spatter in the photographs, it is unlikely that suppression prejudiced Defendant. The State's theory about Joshua's location when he was shot was not meaningfully different from Defendant's version of events. Joshua testified that he was three to four feet from the railing on the steps to the front porch. Patricia testified to the same effect. Steven saw Joshua lying on the pavement six to eight feet from the trailer after the shooting. And Defendant conceded that Joshua did not follow him onto the porch. All accounts put Joshua in the immediate vicinity of the railing surrounding the door to the trailer when the shooting occurred. The real question was not where Joshua was standing, but whether he was advancing on Defendant. No after-the-fact photograph of blood spatter could have resolved that critical issue. *See State v. Duarte*, 2007-NMCA-012, ¶ 11, 140

33

N.M. 930, 149 P.3d 1027 ("[R]eversal is not mandated unless the evidence is in some way determinative of guilt." (internal quotation marks and citation omitted)). On these facts, we defer to the district court's sound discretion not to mandate sanctions of any kind.

{58} We conclude that there was no error in any of the district court's discovery and evidentiary rulings, and therefore, there was no cumulative error. *See State v. Salas*, 2010-NMSC-028, ¶ 40, 148 N.M. 313, 236 P.3d 32.

**D.    Aggravated Assault as a Serious Violent Offense**

{59} This final issue arises, as it often does, because the district court used only boilerplate language in a sentencing document to designate a serious violent offense under Section 33-2-34(L)(4)(o) of the Earned Meritorious Deductions Act (EMDA). The EMDA provides that prisoners convicted of serious violent offenses may earn only four (as opposed to thirty) days per month of good time credit for time served in our state prisons. Section 33-2-34(A)(1), (2). The statute divides serious violent offenses into two categories: (1) an enumerated list of crimes, such as second degree murder, that are serious violent offenses as a matter of law; and (2) several "additional offenses that the district court may determine to be serious violent offenses due to the nature of the offense and the resulting harm." *State v. Scurry*, 2007-NMCA-064, ¶ 5, 141 N.M. 591, 158 P.3d 1034 (internal quotation marks and

citation omitted). Aggravated assault is a discretionary offense under the second category. Section 33-2-34(L)(4)(o). In language mirroring the statute, the district court designated it to be a serious violent offense "due to the nature of the offense and the resulting harm."

{60} When, as here, an offense is discretionary under the statute, "a court's designation of a crime as a serious violent offense affects the length of time the defendant serves time in prison," and therefore "it is important that the court make specific findings both to inform the defendant being sentenced of the factual basis on which his good time credit is being substantially reduced, and to permit meaningful and effective appellate review of the court's designation." *State v. Loretto*, 2006-NMCA-142, ¶ 12, 140 N.M. 705, 147 P.3d 1138. Express findings must demonstrate that the crime was "committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm." *Id.* ¶ 11 (internal quotation marks and citation omitted). Even where support exists in the record for the district court to make such a determination, it is up to the district court "in the first instance to make the required findings." *State v. Morales*, 2002-NMCA-016, ¶ 18, 131 N.M. 530, 39 P.3d 747, *abrogated on other grounds by State v. Frawley*, 2007-NMSC-057, ¶ 36, 143 N.M. 7, 172 P.3d 144.

{61} The State argues that "[t]he evidence presented at trial fully supports the trial court's finding that the aggravated assault conviction was a serious violent offense." But the standard is not whether there is sufficient evidence in the record to support the district court's unexplained conclusion. The standard is a bright line that "requires the district court to explain its conclusions." *Scurry*, 2007-NMCA-064, ¶ 6. We have held in this Opinion that, under *Manus*, Defendant may technically have been convicted of aggravated assault without directing any conduct toward Patricia, without acting recklessly, and without harboring any specific intent to cause apprehension or fear. *See* 1979-NMSC-035, ¶ 14. The district court's findings for sentencing on aggravated assault are both important and required. *Morales*, 2002-NMCA-016, ¶¶ 16, 18.

{62} The State has not pointed out any specific findings in the record. The judgment and sentence contains only the same run-of-the-mill explanation—"due to the nature of the offense and the resulting harm"—that frequently causes us to remand cases for additional factfinding. *See, e.g.*, *State v. Irvin*, 2015 WL 4276092, No. 32,643, mem. op. ¶ 37 (N.M. Ct. App. June 23, 2015) (non-precedential); *State v. Kuykendall*, 2014 WL 5782937, No. 32,612, mem. op. ¶ 37 (N.M. Ct. App. Sept. 23, 2014) (non-precedential); *State v. Ybanez*, 2013 WL 4527245, No. 31,216, mem. op. ¶¶ 18-19 (N.M. Ct. App. Mar. 27, 2013) (non-precedential); *State v. Farrell*, 2010 WL

36

3997938, No. 29,186, mem. op. *7 (N.M. Ct. App. Feb. 3, 2010) (non-precedential); *State v. Salles*, 2009 WL 6677933, No. 29,222, mem. op. *2-3 (N.M. Ct. App. May 1, 2009) (non-precedential).

{63}  We once again remand for findings consistent with the standard described in *Morales*, 2002-NMCA-016, ¶¶ 16, 18, and the cases that have followed it.

**CONCLUSION**

{64}  Defendant's convictions for aggravated assault and aggravated battery, both with a deadly weapon, are affirmed. The firearm enhancements to those convictions are reversed and vacated. Defendant's conviction for negligent use of a deadly weapon is also reversed and vacated. Finally, we remand the serious violent offense designation related to Defendant's aggravated assault conviction back to the district court for specific findings to identify and explain the evidence supporting the designation.

{65}  **IT IS SO ORDERED.**

_____
                                                    **LINDA M. VANZI, Judge**

37

**WE CONCUR:**

_____

**TIMOTHY L. GARCIA, Judge**

_____

**STEPHEN G. FRENCH, Judge**