**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2018-NMCA-008

Filing Date: September 14, 2017

Docket No. A-1-CA-34058

STATE OF NEW MEXICO,

       Plaintiff-Appellee,

v.

JUAN URIBE-VIDAL,

       Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Gary L. Clingman, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Elizabeth Ashton, Assistant Attorney General
Albuquerque, NM

for Appellee

L. Helen Bennett, P.C.
L. Helen Bennett
Albuquerque, NM

for Appellant

**OPINION**

**FRENCH, Judge.**

**{1}** This appeal stems from a jury verdict convicting Defendant Juan Uribe-Vidal of eleven counts of aggravated assault upon a peace officer (deadly weapon), contrary to NMSA 1978, Section 30-22-22(A)(1) (1971), and one count of aggravated battery upon a peace officer (deadly weapon), contrary to NMSA 1978, Section 30-22-25(C) (1971). Defendant raises four issues on appeal: (1) the State presented insufficient evidence to sustain the convictions, (2) the convictions violate Defendant's right to be free from double

1

jeopardy, (3) defense counsel's failure to present evidence proving Defendant's innocence violated Defendant's right to effective assistance of counsel, and (4) Defendant's sentence constitutes cruel and unusual punishment. We affirm.

**BACKGROUND**

**{2}** On November 23, 2012, officers from the Lea County Sheriff's Office and the Hobbs Police Department attempted to execute a search of Defendant's residence pursuant to a warrant. The officers were organized into two SWAT teams, one for a camper on the property and one for a mobile home on the property. The officers arrived at Defendant's property in an armored patrol carrier and, upon exiting the vehicle, one SWAT team began walking toward the camper and the other began walking toward the mobile home. Officer Tovar was part of the SWAT team tasked with entering the camper. When that team was close to the front door of the camper, another officer gave the command for Officer Tovar to deploy a distractionary device, which would emit smoke and conceal their movement. Immediately after Officer Tovar deployed the distractionary device, the officers—including Officer Tovar—heard and saw gunfire coming from the camper. As soon as the officers heard the shots, they tried to take cover behind a nearby tree and another vehicle parked on Defendant's property. When Officer Tovar took cover behind the vehicle, he discovered that he had been shot in his right arm. He remained behind the vehicle until the firefight was over, which lasted about twenty-one seconds and included the exchange of rounds fired from the camper and several rounds fired by one of the officers in front of the camper. Once the gunfire ceased, two officers helped get Officer Tovar back to the armed patrol carrier, and the individuals inside the camper were ordered to come out. Defendant and six others were arrested outside the camper.

**{3}** Law enforcement seized from the camper various firearms, a grenade, a gas mask, a bulletproof vest, and an explosive device. They also discovered a video surveillance system inside the camper, which displayed the area in front of the camper where the SWAT teams had assembled. All of the officers said they could not see who was firing at them from inside the camper, but the gunfire appeared to come from the window and the doorway of the camper.

**{4}** Defendant was charged with thirteen counts of aggravated assault on a peace officer (deadly weapon), one charge for each of the officers present that day, and one count of aggravated battery on a peace officer (deadly weapon), for Officer Tovar, the officer who was shot in the arm. Two counts of aggravated assault were dismissed by directed verdict by the district court before being submitted to the jury. In addition to its substantive instructions, the jury was also instructed on accessory liability. The jury found Defendant guilty of eleven counts of aggravated assault on a peace officer and one count of aggravated battery on a peace officer. Defendant was sentenced to a total of twenty years imprisonment, minus 492 days credit for time served. Defendant appeals his convictions based on the sufficiency of the evidence, double jeopardy, ineffective assistance of counsel, and cruel and unusual punishment.

2

**DISCUSSION**

**Sufficiency of the Evidence**

**{5}** Defendant asserts that there was insufficient evidence to support all of his convictions because the testimony at trial only established that while Defendant owned the property and was present in the camper during the firefight, he was on the floor, not near the window or door from which the shots were fired. Defendant emphasizes the absence of evidence proving that he possessed a gun during the firefight and notes that the DNA evidence from one of the guns only established that Defendant handled the gun at some point in time. Defendant argues it is therefore not reasonable to infer that he shot at the officers outside. Defendant also notes the absence of ballistics tests that could have proven which rounds were fired by the gun that Defendant allegedly handled during the firefight, and argues the State made no effort to determine which of the guns caused Officer Tovar's injury. Therefore, Defendant argues the jury could only have speculated that Defendant participated in the firefight based upon his presence in the camper.

**{6}** "The sufficiency of the evidence is reviewed pursuant to a substantial evidence standard." *State v. Treadway*, 2006-NMSC-008, ¶ 7, 139 N.M. 167, 130 P.3d 746. When reviewing a challenge to the sufficiency of the evidence, we determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. "[W]e must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "In our determination of the sufficiency of the evidence, we are required to ensure that a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

**{7}** The State argues it presented evidence sufficient to support Defendant's convictions because it proceeded on a theory of accessory liability and the evidence determined that Defendant "watched, waited, encouraged, and caused" the criminal conduct. We agree. *See State v. King*, 2015-NMSC-030, ¶ 21, 357 P.3d 949 (noting that "New Mexico long ago abolished the distinction between accessory and principal liability" and "[t]he charge against [the d]efendant as a principal include[s] a corresponding accessory charge, assuming the evidence at trial supported the charge" (internal quotation marks omitted)). Where the State's theory of the case includes accomplice liability, the jury is accordingly instructed and "[t]he sufficiency of the evidence is assessed against the jury instructions because they become the law of the case." *State v. Quiñones*, 2011-NMCA-018, ¶ 38, 149 N.M. 294, 248 P.3d 336.

**{8}** Specifically, the State presented evidence showing that Defendant owned and was inside the camper at the time of the firefight. The State also called as a witness the forensics expert who ran various tests—cartridge casing comparison tests, bullet comparison tests, and function tests—on the cartridge casings and firearms found inside the camper. Of the thirteen firearms found within the camper and provided to the forensics expert for testing, he was able to identify cartridge casings with the .45 caliber colt, the AR-15 caliber rifle, the .40 caliber glock, and the .40 caliber beretta pistol. The bullets that hit Officer Tovar matched the .40 caliber beretta pistol found inside the camper. The State also presented the results of DNA tests performed on several of the firearms. Defendant was not eliminated as a contributor to the DNA found on the beretta pistol. The other six individuals inside the camper were eliminated as contributors to the DNA mixture found on the magazine of the beretta pistol, but there was no conclusion about Defendant being "a possible contributor." Defendant was also found to be a "major contributor" on another firearm, while everyone else in the camper was eliminated, and Defendant was found to be "the source of the major DNA profile" on another one of the many firearms found inside the camper.

**{9}** From this, it was reasonable for the jury to infer that Defendant either shot at the officers himself, or, given the presence of the surveillance system and the availability of firearms and ammunition inside his camper, Defendant encouraged, helped, or caused others to shoot at the officers. Despite the difficulty in proving which of the seven individuals inside the camper actually shot the three guns, there was evidence sufficient to convict Defendant as an agent of the crimes. *See State v. Bahney*, 2012-NMCA-039, ¶ 26, 274 P.3d 134 (noting that "we need only find sufficient evidence under one of the theories presented to uphold [the d]efendant's convictions," and choosing "to address each of the . . . crimes under the [s]tate's theory of accessory liability"). Given all the evidence presented and the alternative manner used to charge Defendant, as well as prove the State's case at trial, we conclude that sufficient evidence supports each of Defendant's convictions.

**Double Jeopardy**

**{10}** Defendant argues that the jury's separate guilty verdicts for one count of aggravated assault and one count of aggravated battery, both involving Officer Tovar as the victim, violated the Double Jeopardy Clause. Whether separate convictions violate double jeopardy is "a question of law, which we review de novo." *State v. Saiz*, 2008-NMSC-048, ¶ 22, 144 N.M. 663, 191 P.3d 521, *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783. The Double Jeopardy Clause prohibits the imposition of multiple punishments for the same offense. *Swafford v. State*, 1991-NMSC-043, ¶ 6, 112 N.M. 3, 810 P.2d 1223. "There are two types of multiple punishment cases: (1) unit of prosecution cases, in which an individual is convicted of multiple violations of the same criminal statute; and (2) double[]description cases, in which a single act results in multiple convictions under different statutes." *State v. Branch*, 2016-NMCA-071, ¶ 20, 387 P.3d 250, *cert. granted*, 2016-NMCERT-_____, _____ P.3d _____ (No. A-1-CA- 35,951, July 28, 2016). Defendant's argument involves separate statutes, raising a double description issue.

4

**{11}** Our courts have established a two-part test for determining whether convictions under different criminal statutes violate the Double Jeopardy Clause. *Swafford*, 1991-NMSC-043, ¶¶ 25-26. First, we determine "whether the conduct underlying the offense[] is unitary, *i.e.*, whether the same conduct violates both statutes." *Id.* ¶ 25. "Whether conduct is unitary depends upon whether the two events are sufficiently separated by either time or space as well as the quality and nature of the acts or the objects and results involved." *State v. Meadors*, 1995-NMSC-073, ¶ 36, 121 N.M. 38, 908 P.2d 731 (omission, internal quotation marks, and citation omitted). "[I]f the conduct is separate and distinct, [the] inquiry is at an end." *Swafford*, 1991-NMSC-043, ¶ 28. If the conduct is unitary, we must then consider "whether the [L]egislature intended to create only alternative means of prosecution or separately punishable offenses." *State v. Cowden*, 1996-NMCA-051, ¶ 6, 121 N.M. 703, 917 P.2d 972.

**{12}** Defendant maintains that the conduct resulting in harm to Officer Tovar was unitary because there was "no temporal distinction between the gun shots resulting in the alleged assaults experienced by the officers, and the shot that hit Officer Tovar's arm[,]" and "[t]he only physical distinction was that Officer Tovar was touched while none of the other officers were." Defendant relies on *State v. Montoya*, 2013-NMSC-020, ¶ 54, 306 P.3d 426, concluding that the same shots, fired at the same time, establish both charges, and "where both convictions were premised on the unitary act of shooting [the victim,]" one must be vacated. *Id.* ¶ 54.

**{13}** The State argues that Defendant's conduct was not unitary because the State's case was based on a theory of accessory liability, which involved multiple perpetrators. Defendant's convictions for aggravated assault and aggravated battery against Officer Tovar could be based on Defendant's commission of the crimes, or it could have been based on accessory liability for having assisted the individual inside the camper who did in fact fire the shot that struck Officer Tovar.

**{14}** We conclude that the conduct is unitary. We examine four cases where our courts have concluded one perpetrator shooting one firearm constitutes unitary conduct. In *Branch*, the defendant pointed a firearm at two people who were standing directly next to one another and fired a single shot, striking only one of the two victims. 2016-NMCA-071, ¶ 7. The jury convicted him of aggravated battery with a deadly weapon (for the victim who was shot) and aggravated assault with a deadly weapon (for the victim who was not shot but reasonably believed the defendant would batter her as well). *Id.* ¶¶ 1-2. We concluded that the firing of a single shot was unitary conduct. *Id.* ¶ 22.

**{15}** In *Cowden*, the defendant was one of several defendants involved in "an incident in which [the d]efendant and others shot at Santa Fe police officers," and only one officer was shot. 1996-NMCA-051, ¶ 2. The defendant was crouched behind the victim's van, pointed his gun at the victim, and upon seeing one another, discharged one shot. *Id.* ¶ 3. The state conceded the conduct was unitary and we agreed. *Id.* ¶ 5. This Court cited to *State v. Gonzales*, 1992-NMSC-003, 113 N.M. 221, 824 P.2d 1023, *overruled on other grounds by*

5

*State v. Montoya*, 2013-NMSC-020, 306 P.3d 426, in support of our conclusion. *Cowden*, 1996-NMCA-051, ¶ 5.

**{16}**     In *Gonzales*, the defendant was convicted of shooting into an occupied motor vehicle and first degree murder. 1992-NMSC-003, ¶ 1. The victim was a passenger in a truck and was killed by shots fired into the truck while the driver drove past the residence of the defendant. *Id.* ¶ 2. Our Supreme Court concluded the conduct was unitary: "the facts presented at trial established that [the] defendant fired multiple gun shots into [the] truck in rapid succession. Because the shots were not separated by either time or space, [our Supreme Court agreed] with the trial court that [the] defendant committed one criminal act." *Id.* ¶ 8 (internal quotation marks omitted).

**{17}**     In *Montoya*, our Supreme Court was asked to determine whether the defendant could be punished for both voluntary manslaughter and shooting at a motor vehicle resulting in great bodily harm. 2013-NMSC-020, ¶ 28. The defendant shot at a vehicle driving by his residence, and the driver of the vehicle died of multiple gunshot wounds. *Id.* ¶ 7. As in *Gonzales*, the state conceded that "[the d]efendant's act of shooting the driver of the [vehicle] was the common factual basis for both the shooting into the motor vehicle and the voluntary manslaughter convictions, and his culpable conduct was therefore 'unitary.' " *Montoya*, 2013-NMSC-020, ¶ 30. Our Supreme Court agreed that the conduct was unitary, citing *Gonzales* for the proposition that "the firing of multiple gun shots into the victim's vehicle in rapid succession constituted unitary criminal conduct[.]" *Montoya*, 2013-NMSC-020, ¶ 30 (alteration, internal quotation marks, and citation omitted).

**{18}**     In summary, in *Branch* and *Cowden*, one perpetrator shot at more than one person only one time. This conduct was unitary. In *Gonzales* and *Montoya*, one perpetrator shot at more than one person, but did so many times. This conduct was also deemed unitary. Here, as in *Gonzales* and *Montoya*, Defendant shot at or, under a theory of accessory liability, encouraged others to shoot at more than one person many times. Based on this Court and our Supreme Court precedent, we conclude that Defendant's conduct was unitary, "[b]ut because this is a double[]description case, where the same conduct results in multiple convictions under different statutes, we must go further before our analysis is complete." *Montoya*, 2013-NMSC-020, ¶ 30 (internal quotation marks and citation omitted).

**{19}**     We turn to the legal question, "whether the [L]egislature intended to create separately punishable offenses." *Swafford*, 1991-NMSC-043, ¶ 25. "Determinations of legislative intent, like double jeopardy, present issues of law that are reviewed de novo, with the ultimate goal of such review to be facilitating and promoting the [L]egislature's accomplishment of its purpose." *Montoya*, 2013-NMSC-020, ¶ 29 (alterations, internal quotation marks, and citation omitted). "When . . . the statutes themselves do not expressly provide for multiple punishments, we begin by applying the rule of statutory construction from *Blockburger v. United States*, 284 U.S. 299 . . . (1932), to determine whether each provision requires proof of a fact that the other does not." *Branch*, 2016-NMCA-071, ¶ 22.

**{20}** For double jeopardy claims involving statutes that are vague and unspecific or written with many alternatives, we do not "apply a strict elements test in the abstract; rather, we look to the state's trial theory to identify the specific criminal cause of action for which the defendant was convicted," and we examine the charging documents and the jury instructions presented. *Id.* ¶ 23. "If the statutes survive *Blockburger*, we examine other indicia of legislative intent[,]" and "we must identify the particular evil sought to be addressed by each offense." *Branch*, 2016-NMCA-071, ¶ 24 (internal quotation marks and citations omitted). "Statutes directed toward protecting different social norms and achieving different policies can be viewed as separate and amenable to multiple punishments." *Swafford*, 1991-NMSC-043, ¶ 32.

**{21}** Defendant provides no argument about the legislative-intent prong. The State argues that the statutory elements of the two crimes are different and address two different social evils: the assault charge required proof of the threat of harm to Officer Tovar; the battery charge required proof that Officer Tovar was injured. Furthermore, the State points out that the assault statute addresses the victim's fear and mental anguish, while the battery statute addresses the ensuing physical harm to the victim, two distinct social evils.

**{22}** We are guided on this issue by our recent opinion in *Branch*. There, we concluded that the crimes of aggravated assault and aggravated battery address societal harms separate and distinct from one another—placing another in fear versus physically injuring another—and therefore survive *Blockburger*. We consider the conclusion reached in *Branch*—that multiple harms can arise from a single gunshot—may also be applied in a case where multiple shots were fired that ultimately produced two distinct harms to a single officer, an assault and a battery. Here, the charging document specifically identified Subsection (1) of Section 30-22-22(A), the subsection prohibiting any unlawful assaulting or striking of a peace officer with a deadly weapon. The jury instruction required the jury to find, among other things, that "[D]efendant's conduct threatened the safety of [Officer] Tovar[,]" and "[D]efendant acted in a rude, insolent or angry manner[.]" It appears that the State proceeded under the "threat" prong of the aggravated assault statute. The State also charged Defendant under Section 30-22-25(C), the section of our aggravated battery statute that makes its commission against a peace officer a third degree felony if it is committed with a deadly weapon such that great bodily harm or death may be inflicted. While some of the elements of the two crimes overlap, each crime requires proof of at least one element that the other does not—assault requires threatening or menacing conduct; battery requires physical injury to the victim. One offense is not subsumed within the other, and *Blockburger* alone does not preclude the possibility of punishment under both the aggravated assault statute and the aggravated battery statute. *See Branch*, 2016-NMCA-071, ¶ 27.

**{23}** Next, we look to the history, language, and subject of the statutes, and identify the particular evil addressed by each statute. *See Montoya*, 2013-NMSC-020, ¶ 32. "[T]he social evils proscribed by different statutes must be construed narrowly[.]" *Swafford*, 1991-NMSC-043, ¶ 32. We have previously determined that aggravated assault under NMSA, 1978, Section 30-3-1(B) (1963) and aggravated battery under NMSA, 1978, Section 30-3-5(A)

7

(1969), address different social evils, albeit in a situation where the victim was not a peace officer. *See Branch*, 2016-NMCA-071, ¶ 28 (explaining that the aggravated battery statute, Section 30-3-5(A), "protects against the social evil that occurs when one person intentionally physically attacks and injures another[,]" but "[t]he culpable act under Section 30-3-1(B), on the other hand, is one that causes apprehension or fear" (internal quotation marks and citation omitted)). Though we now analyze Sections 30-22-22 and 30-22-25, the analysis is the same because the State pursued Defendant's aggravated assault charges based upon Officer Tovar's separate fear of harm during this firefight where multiple shots were fired. Again, here, "the harm related to assault is mental harm; assaults put persons in fear. The harm related to battery is physical harm; batteries actually injure persons." *Branch*, 2016-NMCA-071, ¶ 28 (alteration, internal quotation marks, and citation omitted). In *Branch*, we upheld convictions for aggravated assault and aggravated battery under a double jeopardy analysis, where the defendant pointed a gun at two victims and fired one shot, striking only one of the victims. *Id.* ¶¶ 1, 64. We affirm Defendant's convictions for aggravated assault and aggravated battery upon one police officer because both distinct social harms arose when multiple shots were fired at the officers and caused them all to hide behind a tree and a vehicle in fear of being hit by a bullet, including Officer Tovar who was both fearful of being struck and then actually struck by one of the bullets. As a result, we conclude that Defendant's convictions for aggravated assault and aggravated battery against Officer Tovar do not violate Defendant's right to be free from double jeopardy. *See id.* ¶ 29.

**Ineffective Assistance of Counsel**

**{24}** Defendant argues defense counsel failed to introduce evidence establishing his innocence, thereby violating his constitutional right to effective assistance of counsel. Specifically, Defendant argues trial counsel "erred by failing to present any defense, and by failing to adequately investigate and challenge evidence presented, particularly the evidence that no gun shot residue test was performed on [Defendant]."

**{25}** "We review claims of ineffective assistance of counsel de novo." *Bahney*, 2012-NMCA-039, ¶ 48. In order to establish a prima facie case of ineffective assistance of counsel on appeal, Defendant "must demonstrate that his counsel's performance fell below that of a reasonably competent attorney and that he was prejudiced by his counsel's deficient performance." *State v. Perez*, 2002-NMCA-040, ¶ 36, 132 N.M. 84, 44 P.3d 530.

**{26}** Defendant makes no citation to the record or the trial proceedings showing counsel's failure to investigate and challenge evidence presented. Contrary to Defendant's assertion, the record reflects that defense counsel questioned technicians about the State's failure to perform the gun shot residue tests during trial, specifically inquiring about why the case agent chose not to perform gun shot residue tests on Defendant's palms after the incident and asking questions that made it clear gun shot residue tests, unlike DNA tests, are conclusive evidence of a person firing a firearm. Defense counsel also highlighted the absence of gun shot residue tests during closing argument. We cannot conclude that defense counsel's performance fell below that of a reasonably competent attorney. *See Lytle v. Jordan*,

2001-NMSC-016, ¶ 50, 130 N.M. 198, 22 P.3d 666 ("[J]udicial review of the effectiveness of counsel's performance must be highly deferential, and courts should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (internal quotation marks and citation omitted)); *see also State v. Roybal*, 2002-NMSC-027, ¶ 21, 132 N.M. 657, 54 P.3d 61 (stating that an appellate court presumes that counsel's performance "fell within a wide range of reasonable professional assistance" (internal quotation marks and citation omitted)).

**{27}** Defendant has failed to establish a prima facie case of ineffective assistance of counsel. However, Defendant may bring an ineffective assistance of counsel claim in a habeas proceeding. *See Saiz*, 2008-NMSC-048, ¶ 65 (noting that a defendant "may pursue habeas corpus proceedings on [the ineffective assistance of counsel] issue in the future if he is ever able to provide evidence to support his claims"); *see also State v. Martinez*, 1996-NMCA-109, ¶ 25, 122 N.M. 476, 927 P.2d 31 (stating that if the record does not establish a prima facie case of ineffective assistance of counsel, the defendant must pursue the claim in a habeas corpus proceeding).

**Cruel and Unusual Punishment**

**{28}** Defendant maintains that it was cruel and unusual punishment to sentence him to twenty years imprisonment where there exists no direct evidence of his participation in the firefight. To the extent that Defendant's argument can be construed as a challenge to the sufficiency of the evidence supporting his convictions based on the lack of direct evidence that Defendant himself shot a firearm, we have previously addressed this issue and held that the State presented evidence sufficient to support Defendant's convictions. We also note that Defendant did not preserve his cruel and unusual punishment claim at sentencing. *See State v. Chavarria*, 2009-NMSC-020, ¶ 14, 146 N.M. 251, 208 P.3d 896 ("[A] sentence authorized by statute, but claimed to be cruel and unusual punishment under the state and federal constitutions, does not implicate the jurisdiction of the sentencing court and, therefore, may not be raised for the first time on appeal."). Furthermore, Defendant does not dispute that his sentence is within the range allowed by statute. *See State v. Gardner*, 2003-NMCA-107, ¶ 42, 134 N.M. 294, 76 P.3d 47 ("Regardless of what mitigating evidence [the d]efendant presented, the statutory scheme does not require the trial court to depart from the basic sentence."). Since Defendant's sentence in this case "was authorized by statute, [his] cruel and unusual punishment claim may not be raised for the first time on appeal." *Chavarria*, 2009-NMSC-020, ¶ 14. We conclude there is no fundamental error necessitating reversal of Defendant's convictions and sentence, and therefore, we do not reach the merits of Defendant's cruel and unusual punishment claim.

**CONCLUSION**

**{29}** We affirm all of Defendant's convictions.

**{30}** **IT IS SO ORDERED.**

9

                                                  _____

                                                  **STEPHEN G. FRENCH, Judge**

**WE CONCUR:**

_____

**LINDA M. VANZI, Chief Judge**

_____

**TIMOTHY L. GARCIA, Judge**